**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| EUNIKA D. SMALLS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF GREENSBORO; and TRACEY MICHELLE KENNEDY, in her individual capacity,<br><br>Defendants. | ) | Civil Action No. 1:26-cv-946<br><br>COMPLAINT (JURY TRIAL) |

Plaintiff Eunika D. Smalls, complaining of Defendants, alleges and says:

PRELIMINARY STATEMENT

1. The City of Greensboro's Employee Complaint Resolution policy (H-2) requires a formal investigation of employee complaints, and its Harassment Free Workplace policy (H-10) says Human Resources "will investigate ALL complaints." No investigation of Plaintiff Eunika D. Smalls's October 8, 2023 complaint of retaliation was ever opened. State law guarantees any person the right to attend an open meeting of a public body; the City's first formal discipline of Ms. Smalls, and later her dismissal, cited her attendance at one. This action arises from the distance between what the City wrote down and what it did.

2. On January 25, 2024, the City Council held an open work session at which Ms. Smalls's department presented on housing policy. At 3:08 p.m., Councilwoman Sharon Hightower texted Ms. Smalls to ask where she was and whether she planned to attend. She went, as she regularly did in her role as the Department's Council Liaison. Eight days later her

Director, Defendant Tracey Michelle Kennedy, signed a Decision-Making Leave Day memorandum citing that attendance — the first formal discipline of Ms. Smalls's tenure. The memorandum credited "all other seven staff" with complying with Kennedy's directive; on information and belief, each of the seven is white. The white Assistant Director at Ms. Smalls's pay grade, whose position description likewise contemplated Council contact, was never disciplined for it.

3. Ms. Smalls is African American and was the only Black employee in a senior leadership position in the Department. From 2021 on, she was excluded from meetings, projects, and communications within her own position description while her duties went to white employees. She complained — to Assistant City Manager Ednasha McCray on August 16, 2023, in writing on September 29, to the City Manager on October 5, and in a formal written retaliation complaint under the H-2 policy on October 8. The day after the City Manager meeting, Kennedy told her that she and McCray had expressed extreme displeasure about it and that Kennedy would change Ms. Smalls's job description. On January 24, 2024, the day before the Council session, Kennedy sent Human Resources officials, copying McCray, a timeline whose opening summary said Ms. Smalls had implied that decisions were based on "racial discrimination and exclusion" and that other employees were afraid of being labeled racist. The discipline followed thirteen days later. And on February 7, before Ms. Smalls emailed that afternoon to invoke medical leave, Human Resources had already circulated a draft letter dismissing her on the same Council-session grounds.

4. On February 20, the day after Ms. Smalls requested advanced sick leave, Kennedy cut off her access to all City email and information systems. On March 25 Ms. Smalls filed a charge of discrimination with the EEOC; the City received notice on April 3. On April 19

the City approved her extended leave in writing as a reasonable accommodation under the ADA and asked whether she wished to return to her existing position. Three days later, Kennedy told Department staff that Ms. Smalls "would not be returning." On June 28 Ms. Smalls wrote that she wanted to return as Assistant Director; on July 10, McCray told her that her position "will no longer exist," that her two options were "non-negotiable," and that she had one business day to answer. On August 6 she asked for the balance of the unpaid leave the City's policy allows for up to a year. The answer arrived on August 13, inside a letter dismissing her on the three grounds the February memorandum had recited and stating that Kennedy and McCray had made the decision — six months into that leave, while she remained under treatment and had not been released to return. Yet, white employees who took longer medical leaves kept their jobs. The position that "will no longer exist" was carried vacant for nineteen months and posted again in March 2026.

5. Ms. Smalls appealed under the procedure the dismissal letter supplied. The City set a hearing for August 23, 2024, then canceled it. On October 4, 2024, after review with the City Manager's Office, the official who had signed the dismissal letter wrote that her separation was "a resignation or job abandonment, neither of which are eligible for appeal." The City has since offered at least eight different explanations for its treatment of her — and, while the EEOC's investigation of her charges was pending, paid Kennedy $132,465.83 under a separation agreement that obligates Kennedy to cooperate in the City's defense.

6. Kennedy knew of Ms. Smalls's diagnosed conditions from the City's own pre-employment health form and from messages Ms. Smalls sent her from a treatment center in May 2023. Whether deliberate or careless, Kennedy's conduct — the exclusion, the January timeline,

the discipline, the lockout, and the announcement to staff — foreseeably aggravated those conditions, and Ms. Smalls's clinicians have documented the result.

7. Plaintiff, Ms. Eunika D. Smalls, sues the City under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the North Carolina Equal Employment Practices Act, and sues Kennedy in her individual capacity under 42 U.S.C. § 1981, enforced through 42 U.S.C. § 1983, and for negligent infliction of emotional distress under North Carolina law.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (a)(4) (civil rights). Jurisdiction over the Title VII claims is also conferred by 42 U.S.C. § 2000e-5(f)(3).

9. This Court has supplemental jurisdiction over Plaintiff's North Carolina state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as the federal claims — the same course of conduct, the same decisionmakers, and the same termination.

10. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). Defendant City of Greensboro is located in Guilford County, within this District. The unlawful employment practices alleged in this Complaint were committed within this District, the employment records relevant to those practices are maintained and administered within this District, and Plaintiff would have continued to work within this District but for the unlawful conduct alleged.

11. This is an action for compensatory damages, punitive damages against the individual Defendant, back pay, front pay, declaratory relief, injunctive relief, expungement of Plaintiff's personnel records, and reasonable attorneys' fees and costs.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

12. On or about October 12, 2023, Plaintiff submitted an initial inquiry to the Equal Employment Opportunity Commission.

13. On March 25, 2024, Plaintiff filed a verified Charge of Discrimination with the EEOC, designated Charge No. 435-2024-00045, against the City of Greensboro. That charge alleged discrimination on the basis of race and disability and retaliation, including exclusion from meetings and communications, the withholding of information necessary to her position, the denial of approval and sign-off authority within her position description, and the discipline imposed on February 6, 2024.

14. The charge also specifically described the February 20 suspension of Plaintiff’s City systems access and the February and March denials of Director’s Leave. Plaintiff alleged that those actions were based on race and disability and were retaliation for complaining about racial discrimination and requesting FMLA leave as an accommodation.

15. The City submitted a position statement responding to Charge No. 435-2024-00045 dated on or about May 15, 2024.

16. On November 6, 2024, Plaintiff filed a second verified Charge of Discrimination with the EEOC, designated Charge No. 435-2024-01643, against the City of Greensboro. That charge alleged discrimination on the basis of race and disability and retaliation during the period from on or about June 28, 2024, through August 13, 2024, including the forced transfer, the failure to engage in the interactive process, the failure to respond to her

request for unpaid leave as an ADA accommodation, her discharge, the characterization of her separation as job abandonment, and comparator evidence.

17. That charge was filed approximately eighty-five days after her termination and was timely.

18. The City submitted a position statement responding to Charge No. 435-2024-01643 dated on or about December 12, 2024.

19. On or about June 17, 2026, the EEOC issued a Determination and Notice of Rights on Charge No. 435-2024-00045. On or about July 24, 2026, the EEOC issued a Determination and Notice of Rights on Charge No. 435-2024-01643. This action is filed within ninety days of Plaintiff's receipt of each notice.

20. Plaintiff has satisfied her obligation to exhaust her administrative remedies by timely filing Charges of Discrimination. She has timely filed this original complaint within ninety (90) days of her receipt of the EEOC's issuance of the Notice of Rights to Sue.

21. Plaintiff has satisfied all conditions precedent to the institution of this action under Title VII and the ADA. The allegations of this Complaint are reasonably related to, and grow out of, the allegations of the two charges and the investigation that could reasonably be expected to follow from them.

22. The acts described in Section C below, occurring before 2023, are pleaded as background evidence of Defendants' intent, motive and knowledge, and as component acts of a single continuing hostile work environment. They are not pleaded as independently actionable discrete acts, and Plaintiff does not seek separate relief for them.

23. Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 reach every act alleged in this Complaint without regard to the contents or timing of any administrative charge, including

the August 13, 2024, dismissal, the revocation of her appeal rights, and the October 4, 2024, recharacterization of her separation.

24. No administrative exhaustion is required for Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983, or under North Carolina common law.

## PARTIES

25. Plaintiff Eunika D. Smalls is an African American woman and a citizen and resident of Greensboro, Guilford County, North Carolina.

26. At all times relevant to this Complaint, she was an employee of the City of Greensboro within the meaning of Title VII, 42 U.S.C. § 2000e(f); the ADA, 42 U.S.C. § 12111(4).

27. Plaintiff has impairments that substantially limit one or more major life activities, including but not limited to concentrating, thinking, sleeping, and the operation of neurological and brain function. She also has a record of such impairments and was regarded by Defendants as an individual with such impairments. She is an individual with a disability within the meaning of 42 U.S.C. § 12102 and 29 C.F.R. § 1630.2.

28. At all times relevant to this action, Defendant City of Greensboro is an "employer" within the meaning of 42 U.S.C. §2000e(b).

29. At all relevant times, Defendant was a "covered entity" engaged in an industry affecting commerce and employed at least (15) employees each working day.

30. Defendant City of Greensboro (also referred to hereinafter as "the City") is a municipal corporation organized under the laws of the State of North Carolina, with its principal offices at the Melvin Municipal Office Building, 300 West Washington Street, Greensboro, North Carolina 27401. It may be served through its City Manager and City Attorney.

31. At all relevant times the City employed more than fifteen employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year and was an employer within the meaning of 42 U.S.C. § 2000e(b), 42 U.S.C. § 12111(5), and N.C. Gen. Stat. § 143-422.2.

32. The City was and is a municipal corporation located in Guilford County, North Carolina, duly chartered and existing pursuant to the provisions of N.C. Gen. Stat. § 160A-1 and vested with corporate powers and rights as specified in N.C. Gen. Stat. § 160A-11, including, but not limited to, the capacity to sue and be sued.

33. Defendant City is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It maintains and operates the Housing and Neighborhood Development Department. Employees of the Housing and Neighborhood Development Department are employees and agents of the City, which bears legal responsibility under state law for negligent acts and omissions of Department employees in the course of their employment. The City is responsible for the appointment, training, supervision, promotion and discipline of its employees and supervisory employees, including Defendant Kennedy.

34. The Housing and Neighborhood Development Department is a department of the City of Greensboro and is not a separate legal entity. It is identified in this Complaint for descriptive purposes only; the City is the responsible employer.

35. Further, on information and belief, the City of Greensboro, at the time of the actions taken against Plaintiff, had waived governmental or sovereign immunity from the state law tort claims in this case pursuant to G.S. § 160A-485[1], either by participation in a government

---

[1] Specifically, the statute provides: "Any city is authorized to waive its immunity from civil liability in tort by the act of purchasing liability insurance. Participation in a local government risk pool . . . shall be deemed to be the purchase of insurance for purposes of this section. Immunity shall be waived only to the extent that the city is indemnified by the insurance contract from tort liability." 485(a).

risk pool or through purchase of commercial insurance that will indemnify the City and its agents for any judgment against it or its agents named in this action.

36. Upon information and belief, to the extent that any and/or all of the Defendants in this action claim they are a municipal and/or governmental and/or City owned, operated, and/or funded entity or an employee and/or agent of any such entity such Defendants do not have governmental immunity and/or sovereign immunity for any of the acts or omissions described herein.

37. In the alternative, should any and/or all of the Defendants in this action have governmental immunity and/or sovereign immunity, upon information and belief, any and/or all such Defendants have waived any and all such governmental immunity/or sovereign immunity to which they may have been otherwise entitled for themselves, their agents, employees and all officials acting in their official (and, if applicable, individual) capacities for civil liability and tort by the act of purchasing (or otherwise procuring, obtaining and/or having in place) liability insurance (or the functional and substantive equivalent thereof, i.e., participation in a local governmental risk pool, etc.) prior to, concurrent with, and/or subsequent to and/or applicable to the acts and omissions alleged herein.

38. Defendant Tracey Michelle Kennedy ("Kennedy") is, upon information and belief, a citizen and resident of North Carolina. From on or about August 2021 until March 18, 2025, she was the Director of the Housing and Neighborhood Development Department and was Plaintiff's direct supervisor. She had authority to evaluate Plaintiff's performance, to assign and reassign her duties, to discipline her, to approve or deny her leave, and to recommend and effect her termination. She is sued in her individual capacity.

39. At all relevant times Defendant Kennedy acted under color of state law and within the course and scope of her employment with the City of Greensboro. Her acts and omissions are imputable to the City for purposes of Plaintiff's Title VII, ADA, and state law claims.

40. Defendants City and Kennedy had the right and power to direct and control the manner in which their employees and agents executed their official duties.

41. The City delegated final policy-making authority for promotion, discipline, and training decisions to Defendant Kennedy and ratified her conduct through inaction and failure to investigate employees' complaints.

42. The grossly negligent acts, omissions and liability of all Defendants include their agents, principals, employees and/or servants, both directly and vicariously, pursuant to principles of non-delegable duty, corporate liability, actual authority, apparent authority, actual agency, ostensible agency and/or *respondeat superior* and the acts and/or omissions of the above-named Defendants were a direct and proximate cause of the injuries, damages and losses sustained by the Plaintiff.

43. Upon information and belief, Defendant City has employment practices liability coverage.

44. Upon information and belief, a liability insurance policy issued by the Interlocal Risk Financing Fund of North Carolina provides coverage for some or all of Plaintiff's claims herein.

45. Upon information and belief, the City maintained *some* amount of liability insurance coverage.

46. Upon information and belief, the City is self-funded for tort and general liability claim payments under $100,000. After the original loss of $100,000 is paid, the Local

Government Excess Liability Fund will pay $5,000,000 per occurrence. Additionally, upon information and belief, the Local Government Excess Liability Fund ("LGELF") established by the City helps the City pay claims exceeding the self-funded limit of $100,000.00.

## FACTUAL ALLEGATIONS

### *A. Plaintiff's Employment and Qualifications*

47. The City hired Plaintiff on June 16, 2020, as a Financial/Business Services Analyst, Pay Grade G18, in the Housing and Neighborhood Development Department ("the Department").

48. In August 2022, the City promoted Plaintiff to the position of Senior Manager of Neighborhood Development (Fiscal and Administrative), Position No. 5145, Pay Grade G23. Her working title was Assistant Director — Finance and Administration, and she is referred to in this Complaint as an Assistant Director.

49. Plaintiff was the only Black employee in a leadership position in the Department.

50. When the City hired Plaintiff as the Business Services Analyst, Plaintiff reported to Lamont Taylor, Housing and Neighborhood Development Fiscal and Administrative Manager, and Stanley Wilson was the Director of Housing and Neighborhood Development.

51. Plaintiff's position description made her responsible for the Department's fiscal administration and budget, its human resources functions, and the supervision of five staff members. Her position description expressly contemplated contact with members of the City Council.

52. Plaintiff's duties also included housing development, contracts, requests for proposals, and community outreach and engagement. In describing Plaintiff's work to the EEOC, the City identified those functions and stated that Ednasha McCray's August 16, 2023, meeting with Plaintiff concerned an upcoming presentation Plaintiff was to make to the City Council. The

City also reported Kennedy's acknowledgment that Plaintiff's and Blue's written job descriptions contained overlapping duties.

53. Plaintiff also served as the Department's official City Council Liaison. Her responsibilities included managing interactions between the Department and Council members and maintaining effective communication channels. She regularly attended Council work sessions involving her Department or matters pertinent to her responsibilities.

54. Plaintiff's colleague Cynthia ("Cyndi") Blue, a white woman, held Position No. 7118 at the same Pay Grade G23 in the same Department, reporting to the same Director. The City has confirmed that "the working title for both Smalls and Blue is Assistant Director." Ms. Blue's position description likewise treated City Council contact as an ordinary function of the role, and in a 2022 reclassification form that Plaintiff herself processed, the City rated Council contact as an ordinary Assistant Director function.

55. On December 16, 2020, Ms. Smalls received her six-month probation evaluation, was taken off probation, and received a salary increase.

56. Upon promotion, Plaintiff was paid $105,277. Ms. Blue, at the same pay grade, was paid $106,444. At the time of her separation, Plaintiff's annual salary was $120,363.00 at Grade G23.

57. Plaintiff's base salary at separation was $120,363 and employer-paid benefits totaled $45,642.

58. Plaintiff's total compensation was $175,654 at the time of her separation.

59. At all times relevant, Plaintiff performed her duties competently.

60. In a performance evaluation dated October 31, 2022, Defendant Kennedy described Plaintiff as adjusting well to her role, doing an excellent job leading the Department's

human resources functions, taking her responsibilities seriously, ensuring that deadlines were met, and demonstrating integrity, commitment, and inclusive and supportive leadership.

61. Plaintiff had no formal disciplinary history before February 2024.

62. In or about September 2021, the City appointed Defendant Kennedy, a white woman and a former member of the Greensboro City Council, as the Department's Director at a salary of $120,000. At the time of Plaintiff's termination, Defendant Kennedy received an annual salary of $157,704.00.

***B. The City's Knowledge of Plaintiff's Impairments and Complaints***

63. Defendant City was aware Plaintiff was a qualified individual with a disability.

64. On May 29, 2020, before her employment began, Plaintiff completed and signed the City's Pre-Employment Health Evaluation form. On that City form, Plaintiff disclosed in writing that she had an anemia/blood disorder, depression, anxiety, post-traumatic stress disorder, and hypertension, and she listed her medication regimen. The City has had that document in its own personnel file since 2020.

65. On May 9, 2023, Plaintiff texted Defendant Kennedy from a sleep treatment center, disclosing severe sleep apnea and anemia. Defendant Kennedy replied personally to those messages. Defendant Kennedy, therefore, had actual knowledge of Plaintiff's health impairments no later than May 2023 — approximately nine months before she issued Plaintiff's first discipline.

66. Throughout her employment, Plaintiff was subjected to an ongoing pattern of behavior that included exclusion, misrepresentation, and retaliation.

67. Plaintiff met with the City Manager to have the issues addressed.

68. Defendant City compelled Ms. Smalls to lodge a more formal complaint to address specific incidents of racial discrimination and retaliation and to allow her to request City intervention through the employee complaint resolution process (H-2), which aims to secure mediation services and protection from further retaliatory actions.

69. On October 8, 2023, Plaintiff submitted a formal retaliation complaint to Ednasha McCray, Assistant City Manager, and was assured that the Law and Compliance Department representatives were informed.

70. Shortly after that, on October 12, 2023, Plaintiff filed a pre-charge intake inquiry with the Equal Employment Opportunity Commission (EEOC).

71. On February 7, 2024, Plaintiff notified Defendant Kennedy in writing that she had a serious health condition and invoked her rights under the FMLA.

72. On February 19, 2024, Plaintiff applied for Director's Leave after exhausting her sick leave balance, a benefit that the City approved for several non-Black employees.

73. Despite this precedent and Ms. Smalls's clear eligibility for Director's Leave, the City and Defendant Kennedy denied Plaintiff's request.

74. On July 11, 2024, Plaintiff again notified the City in writing that she is a person with a mental impairment that substantially limits one or more major life activities, that she has a record of such impairment, and that she was entitled to reasonable accommodation under the ADA, including leave.

***C. Exclusion From the Duties of Plaintiff's Own Position***

75. Beginning in or about 2021 and continuing through 2023, Defendant Kennedy and Ms. Blue systematically excluded Plaintiff from meetings, projects, and communications that

fell within Plaintiff's position description. Duties within Plaintiff's position description were reassigned to white employees, including G. Duffield and C. Bowers.

76. Defendants gave Ms. Blue supervisory authority over Plaintiff in 2021, when they allowed Ms. Blue to conduct and sign Plaintiff's annual performance evaluation in October 2021.

77. In October 2021, Plaintiff told Blue that she wanted to use her leadership role to benefit the low-to-moderate-income Black neighborhood where she grew up and asked about investing resources there. Blue responded, "We will not be making any investments in that neighborhood." During a meeting with Plaintiff and Kennedy in the second quarter of 2023, Blue apologized for that remark. Plaintiff reiterated that her community was worthy of investment like other communities.

78. On May 5, 2023, Plaintiff participated with Department colleagues in a policy interview conducted by consultants working on the City's disparity study. When Plaintiff attempted to explain applicable HUD requirements, her contribution was met with silence and the discussion moved to another subject. When she began explaining federal HUD criteria, Blue interrupted and prevented her from finishing. Blue also challenged the HUD participation information Plaintiff supplied, and Plaintiff responded by placing the applicable regulation in the Zoom chat. These exchanges occurred before Plaintiff's colleagues and outside consultants. Although Plaintiff and Blue both held Assistant Director positions, Blue asserted authority over Plaintiff during the interview. Consultant Bridget Wall-Lennon, who participated in the interview, contacted Plaintiff afterward about the exchange.

79. Plaintiff was not included on the invitation to the September 12, 2023, Neighborhood Investment Division budget meeting, although the meeting concerned the

proposed conversion of unused HOME funds for broader program use. Plaintiff nevertheless attended. Bowers's account identified four years of unallocated funds totaling $1,066,663 as the subject of the proposed conversion. Plaintiff questioned whether the Department had adequately solicited eligible nonprofit agencies and developed a base of eligible community housing development organizations before converting the funds, and she brought a highlighted copy of the City's mission and values to the discussion.

80. Plaintiff was never added to the City's approval process that would have allowed her to sign off on Department documents when the Department Director was absent.

81. Plaintiff was treated in a manner that appeared dismissive, exclusionary, and disrespectful.

82. On or about September 25 through 27, 2023, Plaintiff asked to be included in discussions of a Housing Repair Program contract involving Duke Energy and Community Housing Solutions and asked the Assistant City Attorney to include her in the dialogue, because knowledge of that contract bore directly on her budget and fiscal administration duties. Defendant Kennedy denied the request, and Plaintiff was excluded from the communications.

83. On or about November 29, 2023, Defendant Kennedy circulated a directive to Department leadership stating that management would determine which employees attended community meetings according to their job descriptions. Plaintiff customarily attended community meetings before that directive was issued.

84. On or about January 2, 2024, Kennedy notified Plaintiff that Grant Duffield, a white male employee, would replace her as the contact person for the Interfaith Affordable Housing Initiative, a role Plaintiff had held for approximately six to seven months. The City

identified Duffield as a Community Development Analyst in its May 15, 2024, position statement.

85. Defendant Kennedy gave Plaintiff no advance notice and no reason for the change.

86. Plaintiff alleges that the Department Director did not want Plaintiff to attend the community meetings and that Plaintiff was removed as the contact person for the Interfaith Affordable Housing Initiative based on her race and in retaliation for complaining about racial discrimination.

87. Plaintiff was repeatedly excluded from meetings with the Greensboro Housing Coalition's Strategic Planning Committee and discussions concerning the Low-Income Housing Assistance program. Those subjects related to Plaintiff's oversight of community development, fiscal planning, and departmental financial administration. The exclusions deprived Plaintiff of information she needed to oversee that work. Blue, the white Assistant Director in the same Department, was permitted to attend those meetings and had access to the information withheld from Plaintiff.

88. Plaintiff managed the Homebuyers Assistance Program and publicly discussed that program in a television interview. She was removed from its management, and that responsibility was reassigned to Caitlin Bowers, a white employee who reported to another Assistant Director. The reassignment removed an identifiable housing program from Plaintiff's management responsibilities and reduced her role in work she had previously managed and publicly represented.

89. In March 2023, Caitlin Bowers, a white employee, took over review and approval of Homebuyer Assistance Program invoices that Plaintiff had previously handled. In the written

complaint Kennedy later circulated to HR, Bowers expressly described taking over that responsibility and stated that Plaintiff had disputed Bowers's responsibility for the contract payments.

90. Defendants' exclusion of Plaintiff was not a division of labor. It removed from Plaintiff the information and access that her own position description required her to have, while a comparable white Assistant Director retained both.

91. From in or about 2021 through 2023 Plaintiff was kept out of departmental and interdepartmental meetings, programs, contracts and communications falling within her own position description on a repeated and ongoing basis, over a period of approximately three years. The exclusion did not abate after any of her complaints, and it was accompanied by the transfer of her duties to white employees and by the conferral of informal supervisory authority over her on a white colleague of the same pay grade. Plaintiff's exclusion was recurring and continuous rather than episodic.

92. On February 13, 2024, Kennedy publicly accused Nicole Jordan of racism during a staff meeting after receiving private complaints from Caitlin Bowers and Elizabeth Danley Alverson, both white employees. Kennedy had not first discussed the accusations privately with Jordan. After Jordan began responding, Kennedy cleared the room and later resumed the meeting. Jordan resigned from City employment on March 4, 2024.

93. Defendant City did not deny that Plaintiff was ostracized. In its May 15, 2024, position statement, it wrote: ". . . any ostracism has been a result of Smalls' relationship with staff. … So, to the extent, Smalls feels 'ostracized,' it appears to be self-inflicted, as some staff choose not to engage with her."

94. Defendant City characterized Plaintiff, the only Black employee in a senior leadership position in the Department, as having a "habit of dressing down staff"; as "talking down to people"; as the subject of complaints "regarding how Smalls speaks to them" and "the manner in which Smalls talked to them"; and as "insubordinate."

95. Upon information and belief, the employees said to have complained about how Plaintiff speaks were never identified to Plaintiff, their complaints were never documented nor discussed at Plaintiff's performance evaluations, and the City did not initiate an investigation into those complaints.

***D. Plaintiff's Complaints and the City's Failure to Follow Its Own Complaint Policies***

96. On or about August 16, 2023, Plaintiff met with Ednasha McCray, then an Assistant City Manager, and complained of the exclusionary practices described above. McCray told Plaintiff that her concerns would be addressed.

97. One day later, on August 17, 2023, a City Human Resources manager contacted an outside consulting firm to request a leadership coaching engagement "for two deputy directors." The City executed a contract for that engagement on August 25, 2023.

98. Defendant City reframed Plaintiff's complaint of racially exclusionary treatment as an interpersonal conflict between two employees, rather than investigating it.

99. On September 29, 2023, at 9:32 a.m., Plaintiff complained in writing to Defendant Kennedy, copying McCray, describing "yet another example of me being excluded."

100. On or about October 1 and 2, 2023, Plaintiff requested a meeting to discuss her position and her official position description and attached her position description.

101. Defendant Kennedy promised to review the position description during the review process, but the promised meeting never occurred.

102. On October 31, 2023, Kennedy handed Plaintiff her performance evaluation in a hallway without discussing its contents. Plaintiff asked for a follow-up meeting to discuss the evaluation. Kennedy declined the request, stating that she did not have time to meet.

103. After months of communicating her concerns of unfair treatment to Defendant Kennedy, Ms. Blue, and McCray without any improvement, Plaintiff met with City Manager Taiwo Jaiyeoba on Thursday, October 5, 2023, to express her concerns.

104. At that meeting, Plaintiff complained of racial discrimination and exclusionary treatment. The City Manager told Plaintiff he would try to address Plaintiff's concerns within sixty days.

105. On the same day, October 5, 2023, C. Bowers, a white employee, submitted a complaint about Plaintiff to Defendant Kennedy.

106. On October 6, 2023, the day after Plaintiff met with City Manager Taiwo Jaiyeoba, Kennedy told Plaintiff that she and Assistant City Manager McCray had expressed extreme displeasure about that meeting and asked Plaintiff to describe what she had told the City Manager. Plaintiff explained that exclusion from meetings and operational information interfered with her ability to perform her duties and obtain accurate information for community outreach and Council communications.

107. Kennedy criticized Plaintiff's friend and mentor who had conveyed the concerns to a Council member, stating that the friend should have known better and had acted unprofessionally.

108. Kennedy asked whether Plaintiff's concerns centered on racism. Plaintiff answered that she had observed exclusion that limited her access to information and her ability to make informed decisions.

109. Plaintiff asked how including her in meetings and providing information would negatively affect operations. Kennedy referred to departmental resources and requested the job descriptions. When Plaintiff supplied her own and Blue's job descriptions, Kennedy immediately stated that she would change Plaintiff's job description.

110. During the same discussion, Kennedy criticized Plaintiff for missing two of six Leadership Edge Program sessions. Plaintiff reminded Kennedy that she had been on approved medical leave during those sessions.

111. When Kennedy raised delayed audits, Plaintiff explained that she had already supplied the audit schedule and that COVID-19 impacts had caused the delay.

112. When Kennedy raised a concern about Plaintiff's training opportunities, Plaintiff reminded her that the training had been communicated to and approved by Kennedy. Plaintiff described those particular criticisms as newly raised in her contemporaneous written complaint.

113. On October 8, 2023, at 2:20 p.m., Plaintiff submitted a formal written employee complaint to McCray, copying the City's Law and Compliance staff.

114. On October 8, 2023, at approximately 3:21 p.m., Plaintiff emailed McCray, copying Robert Nunn and Nichole Smith, under the subject "Formal Compliant Resolution H-2 Request." Plaintiff expressly characterized the email as a formal complaint and notification of retaliation against Kennedy. She described her October 5 meeting with the City Manager, Kennedy's response on October 6, the interference caused by exclusion from operational information, and Kennedy's threatened changes to her duties. Plaintiff requested participation in the H-2 employee complaint process, protection from retaliation, and mediation services.

115. On October 9, 2023, McCray confirmed receipt of the complaint in writing and asked the City's Law and Compliance staff to follow up on next steps. Defendant City's Law and Compliance official replied the same day that he would schedule a meeting.

116. The City's H-2 policy requires a formal investigation of employee complaints, documentation of findings, written communication of the results to the complaining employee, and protection from retaliation.

117. The City's H-10 Harassment Free Workplace policy provides at § 6.7 that "[t]he Human Resources Department will investigate ALL complaints of alleged violations of this policy," and requires notification of findings to the complainant, disciplinary recommendations where appropriate, reporting to the City Manager and Department Directors, and follow-up with the complainant to ensure no further violations.

118. Section 5.2.F requires the City to maintain a written record of reports made and actions taken under the policy. Sections 5.3.D and 6.4 require every supervisor or manager who observes or receives a complaint to notify Law and Compliance within one business day.

119. Defendant City did not open an investigation into Plaintiff's October 8, 2023, complaint; the City generated no investigative report, made no findings, and communicated no results to Plaintiff at any time.

120. Defendant City did not impose an interim measure of any kind on Defendant Kennedy, the subject of the complaint, at any time.

121. Section 5.6 of the H-10 policy contemplates placing a respondent on paid administrative leave during an investigation and requires consultation with Law and Compliance before moving a complainant.

122. Defendant City did the reverse: the respondent's (Kennedy's) duties were unaffected, while the complainant (Plaintiff) was disciplined, cut off from City systems, and repeatedly asked by the City to leave her position.

123. On October 10, 2023, Plaintiff met with Robert Nunn and Matthew Schweitzer to follow up on her formal complaint email.

124. Shortly afterward, Defendant Kennedy removed several significant duties from Plaintiff, including the faith-based housing initiative and participation in local community groups, that were central to her role. Plaintiff received neither the protection from retaliation nor the written reply that the Personnel Policy Manual requires.

125. On October 12, 2023, Plaintiff submitted an initial pre-charge inquiry to the EEOC.

126. Each City official who took or participated in an adverse action against Plaintiff knew of her protected complaints before taking or participating in the action.

127. McCray received Plaintiff's August 16, 2023, complaint directly, was copied on Plaintiff's September 29, 2023, written complaint, and received Plaintiff's October 8, 2023, written complaint directly.

128. Defendant Kennedy received the September 29, 2023, complaint directly and replied to it the same day.

129. The City Manager received Plaintiff's October 5, 2023, complaint of racial discrimination directly.

130. The City's Law and Compliance staff were copied on the October 8, 2023, complaint and acknowledged receipt.

131. On January 24, 2024, Kennedy provided McCray, Schweitzer, and Smith with written materials expressly identifying Plaintiff's allegations of racial discrimination and exclusion, her approach to McCray, and her arranging a meeting with the City Manager. Those officials were therefore supplied with that information before the February 2024 discipline.

***E. The Dossier and the January 25, 2024, Council Work Session***

132. On January 17, 2024, City employee C. Bowers emailed Defendant Kennedy "additional concerns to *prove* continued incompetence," supplementing her October 5, 2023, complaint about Plaintiff. Bowers made accusations concerning budget reports, the Nussbaum fund, HOME administration funds, the movement of Alamance funds, and ERA funds.

133. Kennedy included that email in the timeline she circulated on January 24.

134. On January 24, 2024, at 10:52 a.m., Kennedy emailed Matthew Schweitzer and Nichole Smith, copying Assistant City Manager McCray, under the subject "ES info." She attached files named "ES HRdoc.docx" and "Employee complaint ES.pdf." Kennedy described the first attachment as a timeline of events relating to Plaintiff and the other as Bowers's formal complaint information sent to her on October 5, 2023. Kennedy invited the recipients to discuss the materials after reviewing them.

135. The opening summary of Kennedy's timeline stated that Plaintiff had implied that decisions with which she disagreed were based on "racial discrimination and exclusion." It attributed a fractured work environment to those complaints and stated that other employees were afraid to speak up for fear of being labeled racist. The summary placed those characterizations alongside allegations that Plaintiff was defensive, resisted feedback, and had performance problems.

136. Kennedy thus placed Plaintiff's allegations of racial discrimination and her escalation of concerns to senior management in the same HR submission as the asserted conduct and performance deficiencies.

137. Kennedy circulated these materials on January 24, 2024, before Plaintiff attended the January 25 Council work session, two days before Kennedy's January 26 confrontation with Plaintiff about that attendance, and thirteen days before the February 6 discipline. The HR submission therefore preceded the Council attendance later cited as a ground for the discipline.

138. On January 25, 2024, the Greensboro City Council held a work session from 2:00 p.m. to 4:09 p.m. The session was an official meeting of a public body, open to the public under N.C. Gen. Stat. § 143-318.10(a). Nine members of the Council attended, together with the Deputy City Manager, the City Attorney, and the Deputy City Clerk.

139. On January 25, 2024, the Department was presenting at a public Council work session. Councilwoman Sharon Hightower and Plaintiff had recently parted at another event. At 3:08 p.m. Hightower texted Plaintiff to ask her whereabouts, and Plaintiff replied that she was in her office. Hightower then asked whether Plaintiff planned to attend the work session. This was a collegial inquiry, rather than a directive to attend. Plaintiff attended a session involving her Department, consistent with her established practice of attending relevant Council meetings and her role as the Department's Council Liaison.

140. The agenda contained two substantive items. The second, "Policy Initiatives: Housing," was introduced by the Deputy City Manager, and Ms. Blue delivered the Department's presentation on it.

141. On January 26, 2024, Defendant Kennedy met with Plaintiff, berated her for attending the work session, and stated that she had told the Department that only she and Ms. Blue could attend.

142. Plaintiff did not recall any such instruction from Defendant Kennedy.

143. Defendant Kennedy told Plaintiff that she "was a problem" and that she "was going to Human Resources" about her.

***F. The February 2024 Discipline***

144. Defendant Kennedy signed a Decision-Making Leave Day memorandum dated February 2, 2024, designating Monday, February 5, 2024, as a paid day away from work.

145. Plaintiff received the memorandum on or about February 6, 2024.

146. On or about February 6, 2024, Plaintiff had another meeting with the Department Director.

147. Upon information and belief, a Decision-Making Leave Day is a step within the City's H-1 Discipline Without Punishment framework. It was the first formal discipline of Plaintiff's tenure with the City.

148. In her EEOC Charge of Discrimination, Plaintiff states that Defendant Kennedy "gave me a write-up for attending the city council meeting and not forwarding communications/inquiries from the city council members directly to her. The Department Director accused me of insubordination and placed me on a Decision Leave Day. The Department Director told me I should return to work on February 7, 2024, so she could meet with me and discuss my continued employment with the City of Greensboro. I believe that I was given a write-up and a Decision Leave Day based on my race and in retaliation for complaining about racial discrimination."

149. Defendant Kennedy’s memorandum recited that Plaintiff had attended the Council work session "although I advised the Leadership Staff, including you, during our meeting on Monday, January 22, 2024, that only those staff presenting should attend."

150. The memorandum further stated: "as I have communicated to you numerous times when a Councilperson contacts staff, they are to refer the Councilperson to me as the Department Director. That is the expectation of the City Manager's Office (CMO) too."

151. Defendant Kennedy asked Plaintiff to reflect on "whether you are committed to following my and the CMO's directives and expectations moving forward." Defendant City has characterized the same directive as Defendant Kennedy's own instruction rather than a City policy.

152. Defendant Kennedy’s memorandum asserted that "all other seven staff in attendance at the Leadership meeting complied with my directive." Upon information and belief, each of those seven employees is white.

153. Defendant Kennedy’s memorandum was issued with its template placeholders unedited. It directed: "You will report to work on <insert date> at <insert time> when we will meet to discuss your continued employment in this role."

154. Defendant Kennedy’s memorandum was copied to McCray and the People and Culture Department.

155. The conduct for which the discipline was issued — attending an open public meeting after an elected official asked whether she planned to attend, and communicating with that official — was conduct that both Assistant Director position descriptions expressly contemplated.

156. Defendant City's 2022 reclassification documentation rated attending open public meetings as an ordinary Assistant Director function.

157. On February 7, 2024, Plaintiff submitted a written rebuttal to the discipline.

158. Upon information and belief, no comparable discipline was imposed on any white employee of the Department for comparable conduct during Plaintiff's tenure.

***G. FMLA Leave, the System Lockout, and the Denial of Director's Leave***

159. On February 7, 2024, the day after the discipline issued, Plaintiff reminded Defendant Kennedy that she had a serious health condition and invoked her rights under the FMLA.

160. Plaintiff informed Defendant Kennedy that she was suffering from a serious health condition that required medical attention.

161. Plaintiff's February 7, 2024, email was sent to Kennedy at 3:34 p.m. and copied Nunn, McCray, and Nichole Smith. It stated that Plaintiff had a serious health condition, could not attend the scheduled meeting, and was requesting FMLA leave effective that day. Kennedy replied at 5:19 p.m., acknowledged the response, stated that she would meet with McCray to review it, and stated that she would instruct Regina to send Plaintiff the FMLA packet and necessary forms.

162. At 2:44 p.m. on February 7, 2024, before Plaintiff's 3:34 p.m. FMLA email, Nichole Smith circulated starting drafts of both an Employee Commitment Agreement and a dismissal letter to Matthew Schweitzer and Robert Nunn. At 3:47 p.m., Schweitzer responded that there would be no meeting that day and that Plaintiff was invoking FMLA. At 4:25 p.m., Nunn circulated both drafted documents to Schweitzer and Jamiah Waterman, copying Smith, and stated that McCray had called him. Nunn forwarded the

documents to Kennedy at 5:04 p.m.; Kennedy forwarded the chain to McCray the following morning.

163. The proposed Employee Commitment Agreement, dated February 8, 2024, contemplated Plaintiff's continued employment subject to stated expectations and review of her progress within two weeks. The separate dismissal draft, also dated February 8, recited the Council-session and Council-communication grounds and stated that Kennedy had discussed Plaintiff's response with McCray. The agreement contained unsigned employee and supervisor signature lines, and the dismissal draft retained a signature placeholder.

164. Plaintiff alleged in her charge of discrimination that the Department Director created a hostile work environment, which exacerbated her disabilities.

165. Defendant City's disability insurer subsequently fixed February 7, 2024, as Plaintiff's adjudicated date of disability.

166. Plaintiff completed Defendant City's FMLA Request Form with a requested start date of February 7, 2024 and expected return date of March 27, 2024.

167. On February 19, 2024, at 8:01 p.m., Plaintiff submitted a written request to the City's Benefits staff for eighty hours of Director's Leave under § 6.A of the City's sick leave policy. That policy provides that where a benefit-eligible employee's sick leave balance is zero, additional sick leave may be advanced, with the Department Director's approval, up to a limit of eighty hours. A zero sick leave balance is the sole eligibility condition stated in the policy. Plaintiff's sick leave balance was zero. The advance would have created a negative balance repayable by Plaintiff and recoverable by the City at separation.

168. Plaintiff's February 19, 2024 request for eighty hours of Director's Leave was denied. Plaintiff was informed on or about February 29, 2024 that the Department Director had denied the request.

169. On March 2, 2024, Plaintiff renewed the request in writing and expressly asked for Director's Leave as a reasonable accommodation for her disabilities. She proposed a sequence: Director's Leave, then purchased leave without pay, then annual leave, and then extended leave without pay.

170. On or about March 4 and 6, 2024, Defendant City denied Plaintiff's renewed request on the ground that Plaintiff had not first exhausted available paid leave although that condition appears nowhere in the text of § 6.A.

171. Upon information and belief, the annual-leave condition appears nowhere in the contemporaneous internal guidance the City's Human Resources Director circulated on February 20, 2024, which identified only consistency with past practice and leave misuse as considerations bearing on such a request.

172. At the request of Defendant Kennedy, an Employee Success Partner within the City's People and Culture Department, instead of the Department Director, in whom § 6.A vests the approval decision, made the determination.

173. Defendant City granted advanced sick leave under § 6.A to white employees who had not complained of discrimination or harassment and who had not filed a Charge of Discrimination with the EEOC.

174. Section 6.A vests the approval decision in the Department Director — Defendant Kennedy, the same official whose conduct Plaintiff had formally complained about four

months earlier, and whose conduct Plaintiff later made the subject of her charge of discrimination with the EEOC.

175. On February 20, 2024, the day after Plaintiff's leave request, Defendant Kennedy suspended Plaintiff's access to all City email and information systems. Plaintiff was on approved medical leave at the time and had not been separated from employment.

176. On or about February 20, 2024, Defendant Kennedy sent Plaintiff a text message telling her that she should not be working while on FMLA leave, that Kennedy would have the IT Department forward Plaintiff's emails to Kennedy, and that Plaintiff would be disconnected from the system.

177. Plaintiff has taken FMLA in the past and was allowed to check emails and have online access to her paycheck stubs and benefits information. Other employees who are not Black have taken medical leave without being disconnected from the system.

178. On February 21, 2024, after a fourteen-day waiting period, Plaintiff began receiving short-term disability benefits under the City's self-funded program at $1,620.27 per week. Those benefits were subject to a 166-day maximum running through August 4, 2024.

179. The City approved Plaintiff's initial request for FMLA leave. It did not, however, designate her FMLA-qualifying absences as FMLA leave.

180. Plaintiff's initial FMLA request included an anticipated return-to-work date of March 27, 2024.

181. The City has given three different accounts of Plaintiff's FMLA entitlement: that it was exhausted on March 19, 2024; that Plaintiff "rolled back onto FMLA" on or about June 27, 2024; and that her FMLA coverage ended on August 8, 2024.

182. In its August 13, 2024 dismissal letter, the City attributed the changes in Plaintiff's FMLA coverage to a rolling calendar year measured from earlier FMLA leave in 2023. The letter stated that Plaintiff's initial FMLA protection had ended, that the City then granted unpaid leave as an accommodation, and that additional FMLA protection later became available and ended on August 8. The City further stated that Plaintiff would not become eligible for FMLA again until 2025.

183. On August 8, 2024, the City declared Plaintiff's FMLA entitlement exhausted and used that declaration as part of the basis for separating her five days later. That computation depended on the same absences the City had not designated as FMLA leave.

***H. The City Approved ADA Leave and Then Announced Plaintiff Would Not Return***

184. In a physician's statement dated February 22, 2024, provided to Defendant City, Plaintiff's physician noted that Plaintiff would be re-evaluated in twelve weeks. A mental health report completed by Plaintiff's treatment provider listed Plaintiff's return-to-work date as July 31, 2024.

185. On March 25, 2024, Plaintiff digitally signed and filed an EEOC Charge of Discrimination, File Number 435-2024-00045, alleging race and disability discrimination, as well as retaliation.

186. On March 27, 2024, Plaintiff requested extended leave without pay under § 5.2.B.1 of the City's F-17 Leave Without Pay policy, expressly as a reasonable accommodation for her disabilities. She memorialized that request in writing on April 15, 2024.

187. On April 3, 2024, Defendant City received notice of Plaintiff's Charge of Discrimination through the Senior Assistant City Attorney, Rosetta Davis.

188. The City's F-17 Leave Without Pay policy stated that non-disciplinary unpaid leave would typically be granted after accrued leave was exhausted and permitted extended leave for an employee's illness, disability, or injury under section 5.2.B.1. Section 5.3.A separately authorized unpaid leave of up to one year for other circumstances not covered by section 5.2, subject to consultation with HR Benefits and Department Director approval. Section 5.3.B provided that qualifying unpaid leave ran concurrently with FMLA protection. Section 5.4 required the employee and the City to continue paying their respective portions of health and dental premiums.

189. The City maintained Reasonable Accommodation Policy I-3, effective September 1, 2023. The policy identified leave, modified schedules or supervisory methods, changes in how or when duties were performed, and reassignment to a vacant position as possible accommodations. It permitted oral or written requests without requiring the employee to use the words "reasonable accommodation," "disability," or "ADA." Section 6.3 required the responsible official to contact the employee within five business days and discuss the limitations prompting the request and potentially effective accommodations.

190. Section 5.12 stated that reassignment was a last resort and that the City preferred first to consider accommodations enabling the employee to perform the essential functions of her existing position. The same provision stated that the City was not required to create a position or displace another employee and provided for a ninety-day vacancy search after placement on unpaid leave following exhaustion of paid leave because the employee could not perform her existing position's essential functions. It permitted separation if a suitable transfer could not be made during that period.

191. Sections 6.5.A–B assigned accommodation decisions to the Reasonable Accommodation Committee and the employee's department and required a written response giving specific reasons for a denial. Before denying an accommodation for undue hardship, the Committee and department were to explore effective alternatives. When a denial included an offer of a different accommodation, the City was to explain why the alternative would be more effective and cause less undue hardship. Section 6.11 assigned decisions to modify or discontinue an accommodation to the Committee and department after referral through HR Law and Compliance.

192. On April 19, 2024, at 1:39 p.m., Nunn emailed Plaintiff that extended leave had been approved as a reasonable accommodation under the ADA in response to her request. In the same email, he stated that he and Schweitzer had discussed return-to-work options with the City Manager's Office. He asked whether Plaintiff wanted to return to her existing position reporting to Kennedy or would prefer a similar role in another department. He also asked Plaintiff to provide an anticipated return-to-work date if she knew one.

193. On April 21, Plaintiff responded that she was receiving cognitive behavioral therapy and medication for her medical condition. She requested the responsibility summary and essential functions of the alternative positions discussed with the City Manager's Office so that her medical providers could evaluate their suitability during her recovery.

194. On April 22, at 9:08 a.m., Nunn replied that he would supply a job description, including duties and responsibilities, once an alternative position had been identified and approved. He expressed hope that this would occur by the end of that week.

195. Later that day, Plaintiff learned that Kennedy had told several Department employees that Plaintiff would not be returning to Housing and Neighborhood Development. Plaintiff promptly wrote to Nunn that she had never indicated returning to the Department was not her goal or intention. She explained that she sought information about alternative positions so her medical provider could consider them alongside her existing position when evaluating her return to work. The City had approved extended leave three days earlier.

196. On the afternoon of April 22, 2024, Defendant Kennedy announced to Department staff that Plaintiff "would not be returning." Plaintiff was at that time on leave that the City had approved in writing three days earlier as an ADA accommodation. At the time Defendant Kennedy emailed Department staff, no alternative position had yet been identified for Plaintiff.

197. Plaintiff objected in writing at 4:07 p.m. that same day and Defendant City acknowledged her objection at 4:11 p.m. Upon information and belief, Defendant City issued no correction of Defendant Kennedy's earlier email to the Department.

198. On April 30, 2024, the City's payment of compensation to Plaintiff ended with a final payment of $4,626.54 covering the period April 17 through 30, 2024.

### *I. The Transfer Ultimatum*

199. On June 17, 2024, the City issued Plaintiff a letter offering her a Business Manager position in the Planning Department at a salary of $120,363, with a decision deadline of July 1, 2024. McCray transmitted the letter on June 18, 2024 at 8:44 a.m.

200. The transfer from Assistant Director to Business Manager in a different department implicated the terms and conditions of Plaintiff's employment.

201. The Business Manager position was not equivalent to the position Plaintiff held. By the terms of the City's own offer letter, it involved "handling cash/check payments for applications, fines, etc.," "assisting other staff in the development of grant applications," and carried no supervisory responsibility. Plaintiff would have had no direct reports, as she had previously supervised five employees in the Housing Department. In the proposed new role, Plaintiff would no longer function as a liaison to the City Council.

202. The June 17, 2024, offer letter stated: "Your employment with the City is at-will. That means either the City, or you can terminate the employment relationship at any time, with or without cause and with or without notice. The employment at-will relationship exists regardless of any other written statements or policies contained in the City's Personnel Policy Manual or any verbal statement to the contrary."

203. The Business Manager position left Plaintiff with no direct reports, where she had supervised five employees; with no responsibility for the Department's fiscal administration and budget or for its human resources functions; with no role as the Department's liaison to the City Council; and without the Assistant Director working title the City had confirmed in writing she held. The change was a reduction in her level of responsibility and a material alteration of the terms, conditions, and privileges of her employment.

204. The City’s Business Manager position was not a lateral reassignment.

205. The purported lateral transfer was, in fact, a change to the conditions of Plaintiff’s employment in violation of Title VII.

206. Although Nunn had raised a return to Plaintiff's existing position as an option on April 19, McCray informed Plaintiff on July 10 that Position No. 5145 would no longer exist and that returning to it was not an option.

207. Plaintiff had stated in writing on June 28 that she desired to return as Assistant Director of Housing and Neighborhood Development.

208. Defendants did not attempt to place Plaintiff in the position she held when she returned from leave.

209. On June 28, 2024, Plaintiff replied in writing: "I desire to return to work as Assistant Director for the Housing and Neighborhood Development department."

210. On July 10, 2024, at 10:15 a.m., McCray sent Plaintiff an ultimatum requiring a decision by the close of business on the following day.

211. McCray's email stated that Plaintiff's Position No. 5145 "will no longer exist"; that returning to that position "is not an option"; that the Business Manager position "will be created" only if Plaintiff accepted it; that her two options were "non-negotiable"; and it pre-scripted how the City would record a separation, specifying "Other Reason for Separation," a note that Plaintiff "refused job transfer/assignment," and that "it will not reflect a dismissal from employment."

212. McCray stated: "I will not ask People & Culture and Planning to create this new position if you do not accept it, as it will take City resources and time to do so."

213. On July 11, 2024, within the deadline, Plaintiff responded. Plaintiff did not refuse or reject the position.

214. Plaintiff reasserted her status as an employee with a disability entitled to accommodation under the ADA, stated that her FMLA rights remained in effect, and

asked for time for her treating provider to review the job duties before her presumed return-to-work date.

215. On July 15, 2024, McCray wrote to Plaintiff setting a third deadline of July 19, 2024, and stating that if Plaintiff did not accept by that date, "the City will move forward with separating your employment." The letter listed four essential functions of the offered position and enclosed the June 17 offer letter.

216. In the same letter the City acknowledged that it could not fully describe the position it was requiring Plaintiff to accept: "Since this is a new position, I am unable at this time to provide you with the percentages of time spent on the various duties and responsibilities."

217. In the same letter, McCray wrote that the essential functions were "related to performing finance and accounting procedures to include preparing budgets, which you should be able to do as a person who holds a CPA License."

218. Defendant City stated in writing that it knew Plaintiff was able to perform the essential functions of the position it offered her.

219. In the same letter, McCray wrote: "As you know, I approved your CPA License renewal reimbursement fees for both the State of North Carolina and Kentucky while you have been out on extended leave for your medical condition."

220. The City recorded Plaintiff's July 11 response as a refusal of the transfer, although Plaintiff had not been released from medical care.

### *J. The August 2024 Accommodation Request and the Termination*

221. On August 4, 2024, Plaintiff's short-term disability benefits were exhausted at the 166-day maximum. She had no income until her long-term disability benefits were approved.

222. On August 6, 2024, Plaintiff sent the City's Human Resources officials a written request for accommodation. She recited the statutory definition of disability and requested continued leave without pay for ongoing treatment, noting that the City's own policy permits such leave for up to one year.

223. Plaintiff followed up on August 7, 2024. She received no substantive response — only a statement that the City would evaluate the request, and notice that her FMLA entitlement would end on August 8.

224. Plaintiff had not been released by her treating providers to return to work.

225. Plaintiff's treatment providers sent the City a mental health provider report, which included a specific date for Plaintiff's return to work.

226. On August 13, 2024, the City's Director of People and Culture sent Plaintiff a letter dismissing her from employment, copying two Assistant City Managers, including McCray. The letter rested the dismissal on three grounds, each of which was the same ground recited in the February 6, 2024, discipline: attending the Council work session in defiance of the Director's instruction; communicating with a Council member without referring that member to the Director; and failing to notify the Director of those communications.

227. The dismissal letter stated that Defendant Kennedy and Ednasha McCray had decided to dismiss Plaintiff, and acknowledged that the City had held continued internal discussions about removing Plaintiff while she was on medical leave.

228. The August 13, 2024 dismissal letter stated that Plaintiff could not return to her senior leadership position in Housing and Neighborhood Development, but that Interim City Manager Chris Wilson believed Plaintiff could succeed in another City position using her knowledge, skills, and abilities. It further stated that discussions with the City Manager's Office and department directors produced the proposed Business Manager position in Planning.

229. The City dismissed Plaintiff nine days after its own short-term disability program stopped paying her, five days after it declared her FMLA entitlement exhausted, while she was in the waiting period for long-term disability benefits, and while she was receiving benefits under the City's own disability program.

230. The City's answer to Plaintiff's August 6, 2024 accommodation request was the dismissal letter itself.

231. Defendant City's F-17 policy authorized leave for up to one year, at a cost limited to the employer share of insurance premiums.

232. Upon information and belief, the City never conducted an undue-hardship analysis, never identified any hardship the requested leave would impose, and never proposed any alternative accommodation.

***K. Plaintiff's Medical Status, Prognosis, and Ability to Return to Work***

233. Plaintiff's impairments were treatable and her treating providers expected improvement.

234. Throughout Plaintiff's leave she remained under continuous care, participated in the treatment prescribed for her, including cognitive behavioral therapy and medication management, and complied with her providers' directions.

235. Plaintiff remained compliant with treatment and no provider ever declined to give a return-to-work opinion on that ground.

236. At no time did Plaintiff state, and at no time did any treating provider certify, that Plaintiff was permanently unable to work or that she would never be able to return to work.

237. No provider withdrew a return-to-work expectation.

238. No provider told the City that she would be unable to return.

239. Plaintiff's disability related paperwork that she and her healthcare provider sent to Defendant City identified return-to-work dates.

240. Plaintiff's treating providers anticipated that, with continued treatment, she would be able to return to work and perform the essential functions of her Assistant Director position on or about November 7, 2024, a date falling within the one-year period the City's F-17 policy authorizes and within the period of leave the City had already approved.

241. Had the City continued the leave it approved on April 19, 2024, for the period its own policy authorizes, Plaintiff would, at the point at which she would have returned from that leave, have been able to perform the essential functions of the position of Assistant Director, with or without further reasonable accommodation.

242. As of August 13, 2024, Plaintiff had not been released to return to her own position without accommodation. The accommodation she sought was a finite period of leave — the same accommodation the City's own policy authorizes for up to one year, and the same accommodation the City had already granted her in writing.

243. The City of Greensboro was the policyholder under Standard Insurance Company's group long-term disability policy No. 639678-H, effective January 1, 2023. The policy provided a 180-day benefit waiting period and defined the Own Occupation Period as the first twenty-four months for which long-term disability benefits were paid. During the waiting period and Own Occupation Period, the applicable disability definition concerned inability, because of a covered condition, to perform with reasonable continuity the material duties of the insured's own occupation, together with the policy's earnings-loss requirement.

244. The policy defined an insured's own occupation by duties of the same general character as the occupation performed when disability began and permitted consideration of how that occupation is performed in the national economy. It was not limited to the insured's particular job with the City. During the Own Occupation Period, the policy permitted work in another occupation while the disability definition remained satisfied, subject to its earnings thresholds. For benefit periods extending beyond the Own Occupation Period, the policy supplied a separate Any Occupation definition, subject to the applicable maximum benefit period and condition-specific limits.

245. The policy contemplated recovery and return to work. It included return-to-work incentives, rehabilitation provisions, and a benefit for certain employer accommodation expenses. Its definition of material duties excluded duties that could reasonably be modified or omitted. Thus, the policy did not require permanent inability to perform every occupation as a condition of benefits during the Own Occupation Period.

### *L. The Appeal, Its Revocation, and the Job Abandonment Recharacterization*

246. The August 13, 2024 dismissal letter enclosed the City's "Appendix: Appeals of Dismissal" and afforded Plaintiff a ten-day period in which to appeal.

247. That appendix provides that a dismissed employee appeals "to the City Manager's Office," that "[t]he City Manager's Office representative will review the written record," and that "[t]he appeal decision by the City Manager's Office will be mailed to the employee's address and is final." Final authority over a dismissal therefore rests, by the City's own written policy, with the City Manager's Office.

248. Section 5.1.B of the City's H-1 Discipline Without Punishment policy authorized the City Manager, Assistant City Managers, Department Directors or their designees, and the People and Culture Director to approve dismissals. It authorized Department Directors to approve dismissals within their departments and the People and Culture Director to approve dismissals other than those of specified senior officials. The dismissal-appeal appendix permitted the City Manager to assign the Deputy or Assistant City Manager over the employee's department to respond to the appeal. The appendix allowed the employee to choose either a written appeal or a recorded virtual meeting, limited to thirty minutes, at which the employee could verbally explain why the dismissal should be overturned. It prohibited in-person meetings and telephone calls to discuss the appeal, required review of the written record, and made the appeal decision final.

249. After the City Manager's Office acted, Plaintiff had no further means of redressing her injuries with Defendant City. The determination communicated on October 4, 2024, was the final decision of the City of Greensboro.

250. Under the Ordinances of the City of Greensboro, final authority over the appointment, discipline, and removal of City employees and over the administration of

the City's personnel policies is vested in the City Manager.  See Greensboro City Ordinances § 21-1 to 21-4.

251. Upon information and belief, Plaintiff's complaint was not the first written complaint of race discrimination that the City received and did not investigate under its H-2 and H-10 policies.

252. Upon information and belief, the City received such complaints from other employees before October 2023, opened no investigation, generated no investigative report, made no findings, and communicated no results, and its final policymakers knew of and acquiesced in that practice.

253. On or about August 16, 2024, the City received Plaintiff's written request for an appeal hearing and scheduled Plaintiff's appeal hearing regarding her dismissal for August 23, 2024.

254. On August 21, 2024, April Albritton confirmed that she had received Plaintiff's written appeal and attachments, and said they had been provided to Chris Wilson, Interim City Manager, for review. Albritton also stated the virtual appeal meeting would be canceled because Plaintiff had chosen to submit the appeal in writing.

255. Plaintiff responded the same day that the written appeal was intended only to request the appeal, not to replace the Zoom option, and she requested that the appeal proceed by Zoom because she had witness testimony. Ms. Albritton then informed Plaintiff that she could not present witness testimony at her appeal hearing and that a written decision would be made within the week.

256. On October 4, 2024, the same official who had signed the August 13 dismissal letter wrote to Plaintiff that her separation was "a resignation or job abandonment, neither

of which are eligible for appeal." The letter asserted that Plaintiff had "repeatedly refused" the transfer, contradicting the same official's August 13 statement that she had "either refused or did not respond." The letter stated that the decision was made after reviewing her case with the City Manager's Office.

257. Plaintiff did not resign and did not abandon her job. She was on leave the City had approved in writing as an ADA accommodation; she was receiving disability benefits from the City's own program through August 4, 2024; she had stated in writing on June 28, 2024 that she desired to return to work as Assistant Director; and she responded within every deadline the City set.

258. Upon information and belief, the City can identify no policy provision, and no date on which any element of any such provision was satisfied, that would support a characterization of Plaintiff's separation as job abandonment.

***M. Comparators and Differential Treatment***

259. The City has identified the comparator described in Plaintiff's second charge as Caitlin Bowers, and has conceded that Ms. Bowers is a white woman, that she had two FMLA-certifying events, that she was out of work for approximately seven months, and that she "remained in her job."

260. Plaintiff was out of work from February 2024 until her dismissal on August 13, 2024 — approximately six months. On the City's own account, a white employee was absent longer than Plaintiff and was not separated.

261. Ms. Bowers is a white woman who was employed in the same Department as Plaintiff. Upon information and belief, her absence was administered under the same City leave policies that governed Plaintiff's absence, including the Leave Without Pay policy

F-17 and the sick leave policy at § 6.A; she was not released to return to work during that absence; her position was not declared eliminated; she was not required to accept a transfer to a position without supervisory responsibility; she was not given approximately thirty hours to decide whether to accept such a position; her request for leave was not answered with a dismissal letter; and she was not separated from employment.

262. A white employee in Plaintiff's Department received approximately one year of medical leave — twice the period Plaintiff received — and returned to her original position.

263. Upon information and belief, the white employee's leave was granted under the same F-17 policy; she was not released to return to work during that leave, her position was not declared eliminated, and she was not dismissed.

264. More generally, the City has permitted employees who are not Black and who had not complained of race discrimination to remain on extended medical leave without an affirmative return-to-work date and without being separated from employment. The City did not extend that treatment to Plaintiff.

265. Ms. Blue, a white woman, held an Assistant Director position in the same Department at the same pay grade, with a position description that likewise contemplated Council contact. The City did not discipline Ms. Blue for Council contact. The City did not eliminate Ms. Blue's position. The City did not require Ms. Blue to accept a non-supervisory transfer.

266. Upon information and belief, the City has granted Director's Leave under § 6.A, and leave without pay under F-17, to employees who are not Black and who had not engaged in protected activity.

267. Plaintiff was the only Black employee in a senior leadership position in the Housing and Neighborhood Development Department during the relevant period.

### *N. The Position Was Not Eliminated*

268. On July 10, 2024, McCray stated in writing that Plaintiff's Position No. 5145 "will no longer exist."

269. Between approximately March 12 and March 19, 2026, the City posted Plaintiff's classification 5145, titled "Mgr. Sr. ND Admin.," as Job No. 05286 — an internal-only posting open for seven days, with a hiring range of $102,001 to $134,212.

270. The position Plaintiff was told would cease to exist was carried vacant for approximately nineteen months and then posted again.

271. In its position statement to the EEOC dated May 15, 2024, the City stated that Plaintiff held the position of Senior Manager of Neighborhood Development (Administrative), "where she remains to date." That statement was made after the City says her FMLA was exhausted, after it approved her ADA leave, and after it had begun discussing her transfer internally. It said nothing about any decided termination, about any refusal to return her to the Department, or about any pending transfer.

### *O. Shifting Explanations*

272. The City has offered materially different explanations for its treatment of Plaintiff at different times: alleged insubordination arising from the Council work session; a division of labor between two Assistant Directors; alleged complaints about how Plaintiff interacted with staff; Plaintiff allegedly working while on FMLA leave; the elimination of her position; her alleged refusal of a transfer; the alleged exhaustion of her FMLA

entitlement; and, finally, alleged resignation or job abandonment. The City's second EEOC position statement, dated December 12, 2024, introduced a further explanation not previously given.

273. In its May 15, 2024 position statement the City described the February 7, 2024 meeting as one at which Plaintiff was to "return to work on February 7th to discuss her employment with the City going forward," and as "the day she was scheduled to meet with Kennedy to discuss the future status of her employment relationship with the City." In its December 12, 2024 position statement the City described the same meeting differently: "At that time, the plan was for Kennedy to terminate the employment relationship with Smalls due to the behavioral issues outlined in the DMLD memo."

274. The December 12, 2024 statement introduced for the first time a decided termination predating Plaintiff's disclosure of her serious health condition; an assertion that Defendant Kennedy "did not want Smalls back"; an assertion that Plaintiff "attempted to use FMLA to insulate herself from termination"; the characterization of the separation as job abandonment; prior undocumented "coaching" sessions; and a February 2 and February 5 chronology for the discipline. None of these appears in the May 15, 2024 statement.

275. On March 5, 2025, while the EEOC investigation of Plaintiff's charges was pending, the City executed a Separation Agreement and General Release with Defendant Kennedy.

276. Upon information and belief, black employees in Plaintiff's department lodged complaints against Defendant Kennedy for race discrimination.

277. The agreement provided Defendant Kennedy payment of $132,465.83, representing twenty-two pay periods at her annual salary of $157,704.00, continued insurance premiums, and a pre-drafted positive letter of recommendation.

278. Defendant City paid Kennedy under the settlement agreement using the General Insurance Fund and labeled it as “Settlement of claim - support is in legal office.”

279. At paragraph 19 the Kennedy agreement obligates Defendant Kennedy to "assist and cooperate with the City in connection with the defense … of any claim that may be made against … the City … including testifying in any proceeding." The obligation runs only to the City and contains no carve-out for testimony adverse to it.

280. At paragraph 8 the Kennedy agreement provides that Defendant Kennedy "agrees not to run for or seek election to the position of Greensboro City Council for ten (10) months from the effective date of this Agreement," breach of which is declared material.

281. At paragraph 10 the Kennedy settlement agreement recites Defendant Kennedy's representation that she was not aware "of any facts or circumstances that could give rise to a lawsuit, claim or demand" against the City. Plaintiff's second EEOC charge was then pending, and the City's position statement responding to it had been submitted to the EEOC.

282. Upon information and belief, Michelle Kennedy stated that, as part of a taxpayer-funded $132,000 separation agreement, she agreed not to seek a seat on the Greensboro City Council during the 2025 election. She wrote; “As part of my $132,000 separation, which taxpayers funded, I was required to agree not to seek a City Council seat during the last election. I’ll let people draw their own conclusions about what that says.”

283. Upon information and belief, in recent texts and Facebook messages, Kennedy stated, “There were no grounds to terminate me. I had excellent performance reviews and no personnel issues. I had made formal complaints about city leadership [also public record], and it seems this is the way Trey Davis chose to respond.”

284. Upon information and belief, Kennedy’s separation agreement, includes the stipulation that “Employee agrees not to run for or seek election to the position of Greensboro City Council for ten [10] months from the effective date of this Agreement.”

285. The City's response to its Director's complaints about City leadership was a negotiated separation with twenty-two pay periods of severance, continued insurance premiums, a pre-drafted letter of recommendation, and a defense-cooperation obligation. The City's response to Plaintiff's complaints of race discrimination and retaliation was a dismissal letter, the cancellation of her appeal hearing, and the recharacterization of her separation as "a resignation or job abandonment."

***P. Injury and Damages***

286. As a direct and proximate result of Defendants’ unlawful, retaliatory, discriminatory, and negligent conduct, Plaintiff suffered and continues to suffer substantial damages, including lost wages, lost employment benefits, loss of accrued and future leave, lost retirement contributions, loss of health and dental coverage, loss of career advancement opportunity, damage to her professional reputation, emotional distress, humiliation, anxiety, and treatment and medication expenses. Plaintiff lost her employment, salary, accrued and future leave, retirement contributions, health and dental coverage, and other employment benefits; her City income ended April 30, 2024, her short-term disability benefits ended August 4, 2024, and she suffered emotional distress,

humiliation, anxiety, reputational harm, loss of career advancement opportunity, and treatment and medication expenses.

287. Plaintiff has suffered severe emotional distress that is more than transient or ordinary workplace upset. Her symptoms include panic attacks, sadness, tearfulness, hopelessness, low self-esteem, isolation, poor concentration, memory problems, agitation, restlessness, excessive worry, racing thoughts, irritability, insomnia, low energy, depression, fatigue, anxiety, humiliation, uncontrollable crying, post-traumatic stress symptoms, fear of crowds associated with the possibility of encountering someone from her workplace, difficulty making decisions, loss of enjoyment of life, anger, and helplessness.

288. Plaintiff's documented symptoms include panic attacks, sadness, tearfulness, hopelessness, isolation, poor concentration, memory problems, excessive worry, insomnia, low energy, depression, fatigue, anxiety, humiliation, uncontrollable crying, post-traumatic stress disorder, agoraphobia related to fear of encountering someone from her workplace, difficulty making decisions, loss of enjoyment of life, anger, and helplessness.

289. Plaintiff's emotional distress has been accompanied by physical manifestations, including irritable bowel syndrome symptoms, frequent trips to the bathroom, hair-pulling symptoms consistent with trichotillomania, sleep-related impairment, excessive fatigue, and aggravation of chronic health problems.

290. Plaintiff alleges that work-related incidents contributed to or aggravated chronic health problems including irritable bowel syndrome, panic attacks, sleep apnea, excessive fatigue, hair pulling, and high blood pressure, and her clinician reported physical

manifestations including irritable bowel syndrome symptoms, frequent bathroom trips, and trichotillomania.

291. Plaintiff's mental-health condition substantially impaired major life activities, including activities of daily living, social functioning, her ability to fulfill responsibilities and obligations to herself, concentration, and adaptation to stress.

292. Plaintiff's documented impairments included limitations in activities of daily living, social functioning, ability to fulfill responsibilities and obligations to herself, concentration, and adaptation to stress.

293. As a result of Defendants' actions, Plaintiff required continuing psychotherapy and medication management, including weekly therapy and more frequent therapy as needed. Her treatment provider documented continuing psychotherapy and medication management, with weekly therapy and additional sessions as needed.

294. Plaintiff's treating clinician has opined that Plaintiff may continue to experience symptoms and PTSD flare-ups triggered by people, places, things, thoughts, and emotions, and that her symptoms significantly impair her ability to function effectively in any workplace setting.

295. Plaintiff's income from the City ended April 30, 2024. Her short-term disability benefits ended August 4, 2024. She had no income from August 5, 2024 until a retroactive long-term disability payment issued in or about late January 2025.

296. Plaintiff has suffered and continues to suffer emotional distress, humiliation, anxiety, damage to her professional reputation, and loss of career advancement opportunity, and has incurred expenses for treatment and medication.

297. Plaintiff has diligently sought to mitigate her damages to the extent her condition permits.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) — Against Defendant City of Greensboro)**

298. Plaintiff realleges and incorporates by reference each preceding paragraph.

299. Plaintiff is African American and is a member of a class protected by Title VII.

300. Plaintiff was qualified for her position as Assistant Director. She met the City's legitimate expectations, as her performance evaluation confirms, and she had no formal disciplinary history before February 6, 2024.

301. The City subjected Plaintiff to adverse employment actions because of her race, including: excluding her from meetings, projects, communications, and sign-off authority within her own position description while a white employee at the same pay grade retained them; reassigning her duties to white employees; removing her as a program contact without notice or reason; issuing her a Decision-Making Leave Day for conduct her position description contemplated; suspending her access to City systems; denying her Director's Leave on a condition the governing policy does not contain; declaring her position eliminated and requiring her to accept a non-supervisory position; failing to respond to her request for leave without pay; dismissing her; and revoking her right to appeal that dismissal.

302. Similarly situated employees outside Plaintiff's protected class were treated more favorably, including the white Assistant Director in the same Department at the same pay grade whose position was not eliminated and who was not disciplined for Council

contact, and the white Neighborhood Reinvestment Manager who received approximately one year of medical leave and returned to her original position.

303. The City's stated reasons for its actions are pretextual. They are contradicted by the City's own documents, they shifted over time, they rest on conduct the City's own position descriptions required, and they were applied to Plaintiff in departure from the City's own written policies while those policies were not applied to protect her.

304. Defendant's actions were with malice and reckless disregard of the Federal civil rights laws.

305. As a direct and proximate result of the foregoing, Defendant discharged Plaintiff from her employment with Defendant.

306. As a direct and proximate result of the foregoing, Plaintiff has suffered emotional and mental anguish. As a direct and proximate result of such actions, Plaintiff has been, is being, and will in the future be deprived of income in the form of wages and of prospective retirement benefits and benefits due her as an employee solely because of Plaintiff's conduct that is protected under 42 U.S.C. § 2000e-3(a), in a sum to be proven at trial.

307. As a direct and proximate result, Plaintiff has suffered the injuries and damages alleged above.

**SECOND CLAIM FOR RELIEF**
**(Race-Based Hostile Work Environment in Violation of Title VII, 42 U.S.C. § 2000e-2(a) — Against Defendant City of Greensboro)**

308. Plaintiff realleges and incorporates by reference each preceding paragraph.

309. Plaintiff was subjected to unwelcome conduct in the workplace, including sustained exclusion from meetings, projects, and communications within her position

description; the reassignment of her duties to white employees; the conferral of informal supervisory authority over her on a same-grade white colleague; being ignored, interrupted, and second-guessed in the presence of an outside consultant; the compilation of an undisclosed adverse file about her; and discipline and removal from her position for conduct her position description required.

310. The conduct was based on Plaintiff's race. Plaintiff was the only Black employee in a senior leadership position in the Department; the duties taken from her were given to identified white employees; and the City's own account of her conduct — that she had a "habit of dressing down staff," that she was "talking down to people," that unnamed employees complained about "how Smalls speaks to them," that she should "stay in [her] respective lane[]," that the City Manager was "put off" by her "random" request to meet and complain of discrimination, and that any ostracism was "self-inflicted, as some staff chooses not to engage with her" — describes the only Black senior leader in the Department in terms it applied to no white employee.

311. The conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive working environment, and Plaintiff subjectively perceived it as such.

312. The conduct is imputable to the City. It was carried out in substantial part by Plaintiff's Department Director, a supervisor with authority over her employment, and it culminated in a tangible employment action — her dismissal. In addition, the City had actual notice of the conduct through Plaintiff's complaints of August 16, September 29, October 5, and October 8, 2023, and failed to exercise reasonable care to correct it: it

opened no investigation, made no findings, communicated no results, and imposed no measure of any kind on the Director.

313. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and in the future will suffer a diminution of her wages and benefits; and has otherwise suffered, continues to suffer, and in the future will suffer damages and losses in the amount of One Million Dollars ($1,000,000.00).

314. Defendant’s conduct was attended by circumstances of fraud, malice, insult, and a reckless and wanton disregard for the rights and feelings of Plaintiff. This Court should award Plaintiff, in addition to any compensatory damages awarded herein, punitive or exemplary damages, both to punish Defendant for its wrongdoing and to make an example for other persons who otherwise might be tempted to engage in similar behavior.

**THIRD CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a) —**
**Against Defendant City of Greensboro)**

315. Plaintiff realleges and incorporates by reference each preceding paragraph.

316. Plaintiff engaged in activity protected by 42 U.S.C. § 2000e-3(a), including: her August 16, 2023 complaint of exclusionary treatment to the Assistant City Manager; her September 29, 2023 written complaint of exclusion; her October 5, 2023 complaint of racial discrimination to the City Manager; her October 8, 2023 formal written complaint of retaliation; her October 12, 2023 EEOC inquiry; her March 25, 2024 EEOC charge; and her November 6, 2024 EEOC charge.

317. The City knew of that activity. McCray received two of the complaints directly and was copied on a third. Defendant Kennedy's own compiled file of January 24, 2024 recorded Plaintiff's complaints.

318. The City took actions against Plaintiff that would dissuade a reasonable employee from making or supporting a charge of discrimination, including the February 6, 2024 discipline, the February 20, 2024 suspension of her system access, the denial of Director's Leave, the announcement to Department staff that she would not be returning, the declared elimination of her position, the transfer ultimatum, the failure to respond to her accommodation request, her dismissal, the revocation of her appeal rights, and the recharacterization of her dismissal as job abandonment.

319. A causal connection exists between the protected activity and the adverse actions. Defendant Kennedy told Plaintiff on October 6, 2023 — the day after Plaintiff complained to the City Manager — that she and McCray were upset that Plaintiff had spoken with him, and stated that she would change Plaintiff's duties. Defendant Kennedy raised previously unmentioned performance criticisms for the first time in that same conversation. Defendant Kennedy compiled and transmitted an adverse file recording Plaintiff's protected complaints two days before the confrontation that produced Plaintiff's first discipline. Plaintiff's system access was suspended the day after she requested leave. Her dismissal followed her EEOC charge and her accommodation requests.

320. Kennedy's January 24 submission expressly presented Plaintiff's racial-discrimination complaints as a source of workplace dysfunction and her approaches to McCray and the City Manager as failures to follow expected channels. Kennedy sent those characterizations to the HR officials she asked to review the materials about Plaintiff and copied McCray before the discipline. Read together with Kennedy's stated displeasure after Plaintiff's October 5 complaint, the threatened changes to Plaintiff's

duties, and the subsequent adverse actions, those facts support Plaintiff's allegation that her complaints were a reason for the treatment she received.

321. The City's stated reasons are pretextual for the reasons alleged above.

322. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and in the future will suffer a diminution of her wages and benefits; and has otherwise suffered, continues to suffer, and in the future will suffer damages and losses in the amount of One Million Dollars ($1,000,000.00).

323. Defendant's conduct was attended by circumstances of fraud, malice, insult, and a reckless and wanton disregard for the rights and feelings of Plaintiff. This Court should award Plaintiff, in addition to any compensatory damages awarded herein, punitive or exemplary damages, both to punish Defendant for its wrongdoing and to make an example for other persons who otherwise might be tempted to engage in similar behavior.

## FOURTH CLAIM FOR RELIEF
## (Race Discrimination and Retaliation in the Making and Enforcement of Contracts, 42 U.S.C. § 1981, Enforced Through 42 U.S.C. § 1983 — Against Defendant Kennedy)

324. Plaintiff realleges and incorporates by reference each preceding paragraph.

325. Section 1981 guarantees all persons the same right to make, perform, modify, and terminate contracts, and to enjoy all benefits, privileges, terms, and conditions of the contractual relationship, as is enjoyed by white citizens. Plaintiff's employment relationship with the City is a contractual relationship within the meaning of 42 U.S.C. § 1981(b).

326. Plaintiff asserts her § 1981 rights against these state actors through 42 U.S.C. § 1983.

327. Defendant Kennedy, acting under color of state law, intentionally interfered with and terminated Plaintiff's contractual employment relationship because of her race and because she complained of race discrimination, through the acts alleged above. Race was a but-for cause of Kennedy's conduct.

328. This claim is brought against Defendant Michelle Kennedy in her individual capacity for damages and all other relief available by law.

329. Plaintiff asserts her § 1981 rights through § 1983 because Defendant Kennedy was a state actor at all relevant times.

330. At all relevant times, Defendant Kennedy acted under color of state law in her capacity as Director of the City of Greensboro Housing and Neighborhood Development Department.

331. Defendant Kennedy exercised supervisory, managerial, and decision-making authority over Plaintiff's employment, duties, work assignments, access to information, communications, discipline, leave-related matters, and employment status.

332. Plaintiff is African American.

333. Plaintiff had an employment relationship with the City of Greensboro that included the right to make, perform, enforce, modify, and enjoy the benefits, privileges, terms, and conditions of employment free from race discrimination and retaliation.

334. Plaintiff was qualified for her position as Assistant Director and performed her job duties competently and satisfactorily.

335. Defendant Kennedy is white.

336. Defendant Kennedy personally participated in race discrimination against Plaintiff by treating Plaintiff less favorably than similarly situated white employees, including Plaintiff's white female Assistant Director counterpart.

337. Defendant Kennedy deprived Plaintiff of equal access to the benefits, privileges, terms, and conditions of her employment by excluding Plaintiff from meetings, communications, stakeholder interactions, programs, strategic planning, departmental decision-making, and projects that fell within Plaintiff's duties and position description.

338. Plaintiff alleged in her EEOC charge that Defendant Kennedy treated Plaintiff's white female coworker more favorably than Plaintiff, excluded Plaintiff from meetings and stakeholder communications, ostracized Plaintiff, and withheld information from Plaintiff.

339. Defendant Kennedy allowed white employees to receive access, information, assignments, visibility, and professional opportunities that were denied to Plaintiff.

340. Defendant Kennedy reassigned, permitted the reassignment of, or failed to prevent the reassignment of Plaintiff's duties and responsibilities to white employees.

341. Defendant Kennedy denied Plaintiff's requests to be included in communications and projects involving external stakeholders, including Duke Energy and Community Housing Solutions.

342. Defendant Kennedy's exclusion of Plaintiff was not a neutral division of labor. The exclusion stripped Plaintiff of information, access, stakeholder contact, visibility, and responsibilities necessary to perform and benefit from her position on equal terms with white employees.

343. On or about January 2, 2024, Defendant Kennedy removed Plaintiff as the contact person for the Interfaith Affordable Housing Initiative, a role Plaintiff had held for approximately six to seven months, and replaced Plaintiff with a white male employee without advance notice or explanation.

344. Defendant Kennedy's conduct impaired Plaintiff's ability to perform, enforce, and enjoy the benefits, privileges, terms, and conditions of her employment relationship.

345. Race was the but-for cause of Defendant Kennedy's discriminatory treatment of Plaintiff.

346. Plaintiff opposed race discrimination and unequal treatment in the workplace.

347. Plaintiff first raised concerns with the City of Greensboro in or about August 2023.

348. On or about October 5, 2023, Plaintiff escalated her concerns by contacting the City Manager regarding racial discrimination and exclusion practices.

349. On or about October 8, 2023, Plaintiff submitted a formal complaint concerning retaliation and racial discrimination to Assistant City Manager Ednasha McCray and requested intervention through the City's employee complaint resolution process.

350. Plaintiff's October 8, 2023 complaint sought protection from further retaliation and requested that the City address Defendant Kennedy's discriminatory and retaliatory conduct.

351. On or about October 12, 2023, Plaintiff initiated contact with the EEOC. Plaintiff later filed a verified EEOC charge alleging race discrimination and retaliation.

352. Defendant Kennedy knew or reasonably should have known that Plaintiff had complained about racial discrimination, racial exclusion, and retaliation.

353. After Plaintiff complained about racial discrimination and exclusion, Defendant Kennedy retaliated against Plaintiff.

354. Defendant Kennedy's retaliatory conduct included confronting Plaintiff after Plaintiff complained to the City Manager, escalating criticism of Plaintiff, raising previously unmentioned performance concerns, continuing to exclude Plaintiff from duties and communications, causing or contributing to discipline, denying or contributing to the denial of Director's Leave, and participating in, influencing, or causing adverse employment actions against Plaintiff.

355. Plaintiff alleged in her EEOC charge that she received a write-up and Decision Leave Day in February 2024 based on race and in retaliation for complaining about racial discrimination.

356. Defendant Kennedy personally participated in, recommended, influenced, or caused the February 2024 discipline imposed on Plaintiff.

357. Defendant Kennedy's stated reasons for the discipline were pretextual.

358. Defendant Kennedy used Plaintiff's complaints about race discrimination, exclusion, and unequal treatment as reasons to scrutinize, isolate, discipline, and undermine Plaintiff.

359. Defendant Kennedy also participated in or caused the denial of Plaintiff's Director's Leave request after Plaintiff had raised concerns about racial inequities within the Department.

360. Plaintiff alleged that the City approved Director's Leave for several non-Black employees but that Defendant Kennedy and the City denied Plaintiff's request.

361. Defendant Kennedy's retaliatory actions would deter a reasonable employee from complaining about racial discrimination or attempting to enforce the right to equal treatment in employment.

362. Plaintiff's protected complaints about race discrimination, racial exclusion, and retaliation were the but-for cause of Defendant Kennedy's retaliatory conduct.

363. Defendant Kennedy personally participated in the deprivation of Plaintiff's federally protected rights.

364. Defendant Kennedy's conduct was not merely supervisory in nature. Defendant Kennedy personally took, directed, influenced, approved, ratified, or knowingly failed to correct the discriminatory and retaliatory actions described herein.

365. Defendant Kennedy's conduct deprived Plaintiff of the same right enjoyed by white employees to make, perform, enforce, modify, and enjoy the benefits, privileges, terms, and conditions of her employment relationship.

366. Defendant Kennedy acted intentionally, willfully, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

367. Defendant Kennedy is liable under § 1983 because, while acting under color of state law, she personally caused the deprivation of Plaintiff's rights secured by § 1981.

368. As a direct and proximate result of Defendant Kennedy's race discrimination and retaliation, Plaintiff suffered damages, including lost wages, lost benefits, loss of accrued and future leave, loss of retirement contributions, loss of health and dental coverage, loss of career advancement opportunity, damage to professional reputation, emotional distress, humiliation, anxiety, depression, post-traumatic stress symptoms, panic attacks,

insomnia, impaired concentration and memory, social withdrawal, loss of enjoyment of life, and expenses for therapy, medication, and other treatment.

369. Plaintiff is entitled to recover compensatory damages from Defendant Kennedy in her individual capacity.

370. Plaintiff is entitled to recover punitive damages from Defendant Kennedy in her individual capacity because Defendant Kennedy acted intentionally, maliciously, willfully, wantonly, and/or with reckless indifference to Plaintiff's federally protected rights.

371. Plaintiff is also entitled to recover attorneys' fees, costs, interest, and all other relief permitted by law.

**FIFTH CLAIM FOR RELIEF**
**(Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a) — Against Defendant City of Greensboro)**

372. Plaintiff realleges and incorporates by reference each preceding paragraph.

373. At all relevant times, Defendant was a covered employer within the meaning of the Americans with Disabilities Act.

374. At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

375. Plaintiff has mental and physical impairments, including major depressive disorder, anxiety, post-traumatic stress disorder, anemia/blood disorder, hypertension, severe sleep apnea, and related conditions.

376. Plaintiff's impairments substantially limited one or more major life activities, including working, sleeping, concentrating, thinking, interacting with others, caring for

herself, performing activities of daily living, social functioning, fulfilling responsibilities and obligations to herself, and adapting to stress.

377. Defendant knew of Plaintiff's disability and disability-related limitations.

378. Plaintiff disclosed depression, anxiety, post-traumatic stress disorder, anemia/blood disorder, hypertension, and medication use before her employment began.

379. Plaintiff later disclosed severe sleep apnea and anemia to Defendant Kennedy, who personally responded to Plaintiff's communication.

380. Plaintiff notified Defendant Kennedy in writing that she had a serious health condition and needed medical leave.

381. Plaintiff also notified Defendant that she had a mental impairment substantially limiting major life activities, had a record of such impairment, and was entitled to reasonable accommodation, including leave.

382. At all relevant times, Plaintiff was qualified to perform the essential functions of her Assistant Director position, with or without reasonable accommodation.

383. Plaintiff performed her duties competently and satisfactorily before Defendant's adverse actions.

384. Plaintiff had no formal disciplinary history before Defendant began taking adverse action against her in 2024.

385. Defendant subjected Plaintiff to adverse employment actions because of her disability, record of disability, perceived disability, and need for disability-related leave and accommodation.

386. Defendant's adverse actions included disciplining Plaintiff, suspending Plaintiff's system access, denying or obstructing medical leave, refusing to accommodate Plaintiff's

disability, failing to engage in a meaningful accommodation process, announcing that Plaintiff would not return to the Department, eliminating Plaintiff's Assistant Director position while she was on short-term disability leave, attempting to force Plaintiff into an inferior transfer, revoking Plaintiff's appeal rights, recharacterizing Plaintiff's separation as job abandonment, and terminating or constructively discharging Plaintiff.

387. Defendant treated Plaintiff less favorably than similarly situated employees who were not disabled, were not perceived as disabled, did not have known disability-related limitations, and did not need disability-related leave.

388. Defendant eliminated Plaintiff's Assistant Director position under Defendant Kennedy while not eliminating the other Assistant Director position under Kennedy held by a non-disabled white female employee.

389. Defendant's stated reasons for its adverse actions were pretextual.

390. Defendant's adverse actions occurred after Defendant knew of Plaintiff's disability, after Plaintiff requested medical leave, and after Plaintiff sought disability-related accommodation.

391. The timing, sequence, and circumstances of Defendant's adverse actions support a reasonable inference that Plaintiff's disability, record of disability, perceived disability, and need for disability-related leave were the but-for cause of Defendant's adverse employment actions.

392. Defendant discriminated against Plaintiff with respect to the terms, conditions, and privileges of employment because of Plaintiff's disability.

393. Defendant knowingly and intentionally discriminated against Plaintiff in violation of Title I of the ADA.

394. Defendant is liable for the acts and omissions of its managers, supervisors, agents, and employees, including Defendant Kennedy and other City decisionmakers who participated in, approved, ratified, or failed to remedy the discriminatory treatment.

395. As a direct and proximate result of Defendant's disability discrimination, Plaintiff suffered damages, including lost employment, lost wages, lost benefits, loss of accrued and future leave, loss of retirement contributions, loss of health and dental coverage, loss of career advancement opportunity, damage to professional reputation, emotional distress, humiliation, anxiety, worsening depression and post-traumatic stress symptoms, panic attacks, insomnia, fatigue, impaired concentration and memory, social withdrawal, loss of enjoyment of life, and treatment and medication expenses.

396. Defendant's discriminatory conduct was willful, intentional, malicious, and/or undertaken with reckless indifference to Plaintiff's federally protected rights.

397. Plaintiff is entitled to all relief available under the ADA, including back pay, front pay or reinstatement, compensatory damages, punitive damages to the extent permitted by law, reasonable attorneys' fees, costs, interest, and all other relief the Court deems just and proper.

398. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and in the future will suffer a diminution of her wages and benefits; and has otherwise suffered, continues to suffer, and in the future will suffer damages and losses in the amount of One Million Dollars ($1,000,000.00).

399. Defendant's conduct was attended by circumstances of fraud, malice, insult, and a reckless and wanton disregard for the rights and feelings of Plaintiff. This Court should award Plaintiff, in addition to any compensatory damages awarded herein, punitive or

exemplary damages, both to punish Defendant for its wrongdoing and to make an example for other persons who otherwise might be tempted to engage in similar behavior.

**SIXTH CLAIM FOR RELIEF**
**(Failure to Accommodate and Failure to Engage in the Interactive Process in Violation of the ADA, 42 U.S.C. § 12112(b)(5)(A) — Against Defendant City of Greensboro)**

400. Plaintiff realleges and incorporates by reference each preceding paragraph.

401. Since at least 2020 through the present, Plaintiff has been mentally and physically impaired due to her diagnoses of major depressive disorder, anxiety, post-traumatic stress disorder, anemia/blood disorder, hypertension, and severe sleep apnea.

402. At all relevant times, Plaintiff's mental and physical conditions have substantially limited her major life activities, including but not limited to working, sleeping, concentrating, thinking, interacting with others, caring for herself, performing activities of daily living, social functioning, fulfilling responsibilities and obligations to herself, and adapting to stress.

403. At all relevant times, Plaintiff was qualified as "disabled" pursuant to the ADA because she was actually impaired as described in 42 U.S.C. § 12102(1)(A).

404. Plaintiff requested reasonable accommodations. Specifically, Plaintiff notified Defendant Kennedy in writing on February 7, 2024, that she had a serious health condition and invoked her right to medical leave. Plaintiff later notified Defendant in writing on July 11, 2024, that she had a mental impairment substantially limiting one or more major life activities, had a record of such impairment, and was entitled to reasonable accommodation, including leave.

405. At all relevant times, Plaintiff was qualified to perform the essential duties of the Assistant Director position with the requested reasonable accommodation of medical

leave, including continued unpaid leave and return to her Assistant Director position after the leave period.

406. Defendant did not make a good faith effort to accommodate Plaintiff's disability.

407. All accommodations requested by Plaintiff were reasonable.

408. None of the accommodations requested by Plaintiff would have created an undue hardship for Defendant.

409. Defendant failed to communicate with Plaintiff meaningfully and in good faith concerning her disability and requested accommodations.

410. Defendant discriminated against Plaintiff in violation of the ADA by refusing to accommodate her disability.

411. Defendant knowingly and intentionally discriminated against Plaintiff because of her disability.

412. Defendant is liable for the acts and omissions of its agents and employees.

413. Plaintiff suffered injuries as a result of Defendant's failure to reasonably accommodate her disability, including loss of employment, lost wages, lost benefits, loss of leave, loss of retirement contributions, loss of health and dental coverage, treatment and medication expenses, emotional distress, humiliation, anxiety, worsening depression and post-traumatic stress symptoms, panic attacks, insomnia, fatigue, impaired concentration and memory, social withdrawal, loss of enjoyment of life, damage to professional reputation, and loss of career advancement opportunity.

414. Defendant's failure to accommodate Plaintiff's disability was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

415. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when it refused to provide a reasonable accommodation for her disability despite knowing that Plaintiff had serious mental and physical impairments, had requested medical leave, and needed accommodation to preserve her employment and return to work.

416. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and in the future will suffer a diminution of her wages and benefits; and has otherwise suffered, continues to suffer, and in the future will suffer damages and losses in the amount of One Million Dollars ($1,000,000.00).

417. Defendant's conduct was attended by circumstances of fraud, malice, insult, and a reckless and wanton disregard for the rights and feelings of Plaintiff. This Court should award Plaintiff, in addition to any compensatory damages awarded herein, punitive or exemplary damages, both to punish Defendant for its wrongdoing and to make an example for other persons who otherwise might be tempted to engage in similar behavior.

**SEVENTH CLAIM FOR RELIEF**
**(Retaliation in Violation of the ADA, 42 U.S.C. § 12203(a) — Against Defendant City of Greensboro)**

418. Plaintiff realleges and incorporates by reference each preceding paragraph.

419. Plaintiff engaged in protected activity when she asked Defendant for reasonable accommodations for her disability, including when she notified Defendant Kennedy in writing on February 7, 2024, that she had a serious health condition and invoked her right to medical leave, and when she notified Defendant in writing on July 11, 2024, that she had a mental impairment substantially limiting one or more major life activities, had a

record of such impairment, and was entitled to reasonable accommodation, including leave.

420. Plaintiff engaged in protected activity when she opposed Defendant's refusal to accommodate her disability and its retaliation against her for her protected activity. Plaintiff also engaged in protected activity by objecting to Defendant's failure to accommodate her disability, opposing the elimination of her Assistant Director position while she was on medical leave, opposing Defendant's attempt to force her into an inferior transfer instead of returning her to her position or extending leave, complaining about discriminatory and hostile treatment, complaining about exclusion and different treatment, filing or pursuing charges of discrimination, and otherwise opposing conduct she reasonably believed violated the ADA.

421. As a direct result of Plaintiff's request for a reasonable accommodation and opposition to conduct prohibited by the ADA, Defendant retaliated against Plaintiff by suspending her system access after she requested leave, denying or obstructing her medical leave and accommodation requests, failing to engage in a meaningful good-faith accommodation process, announcing to Department staff that she would not be returning, declaring the elimination of her Assistant Director position while she was on short-term disability leave, attempting to force her into an inferior transfer, refusing to allow her to continue on unpaid leave as a reasonable accommodation, terminating or constructively discharging her, revoking her appeal rights, and recharacterizing her separation as job abandonment.

422. Defendant treated Plaintiff less favorably than her similarly situated counterparts who did not engage in protected activity, including by eliminating Plaintiff's Assistant

Director position under Defendant Kennedy while not eliminating the other Assistant Director position under Kennedy held by a white female employee.

423. Defendant coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of her rights under the ADA by taking adverse employment actions after Plaintiff disclosed serious health conditions and requested leave; suspending her system access after she requested leave; refusing to communicate meaningfully about her requested accommodation; eliminating her position while she was on short-term disability leave; attempting to force her into an inferior transfer instead of restoring her to her position or extending leave; refusing to allow her to continue on unpaid leave; terminating or constructively discharging her; revoking her appeal rights; and recharacterizing her separation as job abandonment.

424. Defendant is liable for the acts and omissions of its agents and employees. Defendant, either directly or by and through its agents, retaliated against Plaintiff and caused her injuries, damages, and losses.

425. Defendant's retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses, including lost employment, lost wages, lost benefits, loss of accrued and future leave, loss of retirement contributions, loss of health and dental coverage, emotional distress, humiliation, anxiety, worsening depression and post-traumatic stress symptoms, panic attacks, insomnia, fatigue, impaired concentration and memory, social withdrawal, loss of enjoyment of life, damage to professional reputation, loss of career advancement opportunity, and treatment and medication expenses.

426. Defendant's conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA because Defendant knew Plaintiff had serious

mental and physical impairments, knew Plaintiff requested medical leave and disability accommodation, knew Plaintiff opposed the denial of accommodation and other disability-related adverse treatment, and nevertheless retaliated against her, interfered with her protected rights, eliminated her position, refused to reasonably accommodate her, and ended or constructively ended her employment.

427. As a direct and proximate result, Plaintiff has suffered the injuries and damages alleged above.

428. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and in the future will suffer a diminution of her wages and benefits; and has otherwise suffered, continues to suffer, and in the future will suffer damages and losses in the amount of One Million Dollars ($1,000,000.00).

429. Defendant's conduct was attended by circumstances of fraud, malice, insult, and a reckless and wanton disregard for the rights and feelings of Plaintiff. This Court should award Plaintiff, in addition to any compensatory damages awarded herein, punitive or exemplary damages, both to punish Defendant for its wrongdoing and to make an example for other persons who otherwise might be tempted to engage in similar behavior.

## EIGHTH CLAIM FOR RELIEF
**(Negligent Infliction of Emotional Distress — Against Defendant Kennedy in Her Individual Capacity)**

430. Plaintiff realleges and incorporates by reference each preceding paragraph.

431. Plaintiff Eunika D. Smalls began employment with the City of Greensboro in June 2020.

432. At all times relevant, Defendant Tracey Michelle Kennedy served as the City's Housing and Neighborhood Development Director and personally exercised supervisory authority and responsibilities concerning Plaintiff. Plaintiff brings this Count against Kennedy in her individual capacity for her own conduct.

433. Defendant Michelle Kennedy personally undertook supervisory and managerial responsibility over Plaintiff when Kennedy became Director of the City of Greensboro Housing and Neighborhood Development Department in or about September 2021 and thereafter supervised Plaintiff's work, duties, assignments, communications, complaints, leave-related communications, and employment status. Under Kennedy's undertaking of supervisory authority over Plaintiff, Kennedy's actual knowledge of Plaintiff's health impairments, and Kennedy's role in controlling or influencing the conditions of Plaintiff's employment, Kennedy owed Plaintiff a duty to exercise reasonable care in performing supervisory functions affecting Plaintiff's work duties, workplace treatment, complaints of discriminatory and hostile conduct, medical-leave communications, and employment status.

434. Before the negligent conduct alleged below, Defendant knew or reasonably should have known that Plaintiff faced a risk of severe emotional injury because Plaintiff had disclosed depression, anxiety, and post-traumatic stress disorder on the City's pre-employment health evaluation in May 2020; Plaintiff texted Kennedy from a sleep treatment center on May 9, 2023, disclosing severe sleep apnea and anemia, and Kennedy personally responded; Plaintiff notified Kennedy in writing on February 7, 2024, that she had a serious health condition and invoked FMLA rights; and Plaintiff had complained to

Kennedy and City management about discriminatory treatment, exclusion, and harassment.

435. On or about 2021 through 2024, Defendant breached the duty identified above by excluding Plaintiff from meetings, projects, communications, strategic planning, and departmental decision-making within Plaintiff's job responsibilities; allowing or participating in the reassignment of Plaintiff's duties to white employees; failing to respond reasonably to Plaintiff's complaints of discriminatory and hostile treatment; escalating criticism and adverse treatment after Plaintiff complained; falsely accusing Plaintiff of insubordination; participating in or contributing to adverse employment actions while knowing Plaintiff had serious health conditions; and failing to take reasonable steps to prevent foreseeable emotional harm to Plaintiff.

436. Reasonable care under those circumstances required Defendant to respond promptly and fairly to Plaintiff's complaints, refrain from retaliatory or discriminatory changes to Plaintiff's duties, maintain Plaintiff's access to the duties and communications necessary to perform her position, avoid unsupported discipline or accusations, engage in a reasonable and good-faith response to Plaintiff's medical-leave and disability-related communications, and avoid employment actions that would foreseeably worsen Plaintiff's known mental-health conditions. Defendant failed to take those actions, as shown by Plaintiff's exclusion from meetings and projects, reassignment of her duties to white employees, dismissal or minimization of her complaints, discipline and adverse treatment after protected complaints, denial or obstruction of medical leave and accommodation, and the elimination of Plaintiff's position while she was on short-term disability leave.

437. It was reasonably foreseeable that Defendant's negligent conduct would cause or materially aggravate a severe and disabling emotional condition in Plaintiff.

438. Defendant's negligent conduct was a proximate cause of the aggravation of Plaintiff's depression, anxiety, panic symptoms, and post-traumatic stress symptoms beginning no later than April 2022 and worsening through 2024. Plaintiff's treating clinician reported that Plaintiff had been stable and progressing in cognitive therapy when she began working for the City, but her mental-health symptoms increased after work-related incidents, including being removed from responsibilities and excluded from strategic planning and departmental decision-making within her job description. Plaintiff resumed Xanax for panic attacks in December 2022 after reporting that she had not needed Xanax since 2019, and her symptoms continued to worsen after further exclusion, complaints, discipline, medical-leave issues, and the elimination of her position under Kennedy.

439. Plaintiff's worsened symptoms included panic attacks, uncontrollable crying, insomnia, excessive fatigue, persistent anxiety, depressed mood, social withdrawal, loss of enjoyment of life, and impaired concentration and memory.

440. By July 24, 2024, Plaintiff's symptoms substantially impaired her activities of daily living, social functioning, ability to fulfill responsibilities to herself, concentration, and adaptation to stress. Her treating clinician also documented fear of crowds associated with the possibility of encountering someone from her workplace.

441. As of July 24, 2024, Plaintiff was receiving continuing psychotherapy and medication management, including therapy weekly and more frequently as needed. She

reported resuming Xanax for panic attacks in December 2022 after reporting that she had not needed it since 2019.

442. On July 24, 2024, Plaintiff's treating clinician opined that Plaintiff's symptoms significantly impaired her ability to function effectively.

443. Plaintiff experienced severe emotional distress manifested by disabling symptoms of recognized mental and emotional disorders. This Count seeks recovery for the aggravation of Plaintiff's depression, anxiety, panic attacks, post-traumatic stress symptoms, insomnia, fatigue, impaired concentration and memory, social withdrawal, fear of workplace-related encounters, loss of enjoyment of life, and related physical manifestations proximately caused or materially aggravated by Kennedy's negligent supervisory conduct, failure to respond reasonably to Plaintiff's complaints and known health risks, and participation in adverse employment actions affecting Plaintiff's duties, leave, accommodation, and employment status.

444. Plaintiff seeks compensatory damages for the emotional suffering and impairment of daily functioning attributable to the injury or aggravation, reasonable and necessary additional treatment expenses caused by that injury or aggravation, and any future losses shown with the degree of certainty required by law, in amounts to be established at trial.

445. WHEREFORE, Plaintiff requests judgment against Defendant Tracey Michelle Kennedy, individually, for compensatory damages, interest and taxable costs as allowed by law, and such other relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
**(Wrongful Discharge in Violation of North Carolina Public Policy, N.C. Gen. Stat. § 143-422.2 — Against Defendant City of Greensboro)**

446. Plaintiff realleges and incorporates by reference each preceding paragraph.

447. Plaintiff was an at-will employee of the City of Greensboro. She was not employed for a definite term and was not subject to discharge only for cause.

448. The City regularly employed fifteen or more employees at all relevant times.

449. The North Carolina Equal Employment Practices Act declares: "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2.

450. Plaintiff is a member of two classes that the provision protects: she is African American, and she has a handicap within the meaning of the statute.

451. The City discharged Plaintiff on August 13, 2024. She was actually discharged; the City's own letter dismissed her.

452. The City discharged Plaintiff because of her race and because of her handicap. Her race and her handicap were substantial and motivating factors in the decision to discharge her.

453. That discharge violated the express public policy of the State of North Carolina declared in N.C. Gen. Stat. § 143-422.2.

454. The City has waived governmental immunity from this claim to the extent alleged above.

455. As a direct and proximate result, Plaintiff has suffered lost wages and benefits, future lost earnings, emotional distress, and injury to her professional reputation, for which she is entitled to recover.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eunika D. Smalls respectfully prays that this Court:

a. Declare that the acts and practices complained of herein violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983, the Americans with Disabilities Act, and the public policy of the State of North Carolina;

b. Enjoin and permanently restrain Defendants from further violations of Plaintiff's rights, and direct Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated;

c. Order that Plaintiff be reinstated to her position as Assistant Director, or to a substantially equivalent position, at such time as her treating providers release her to return to work; or, in the alternative, award front pay in lieu of reinstatement;

d. Award Plaintiff back pay, lost benefits, lost retirement contributions, and prejudgment interest;

e. Award Plaintiff compensatory damages for emotional distress, humiliation, injury to professional reputation, and expenses for treatment and medication, in an amount to be determined by the jury;

f. Award punitive damages against Defendant Kennedy in her individual capacity in an amount sufficient to punish and to deter;

g. Order the City to expunge from Plaintiff's personnel file the February 6, 2024, Decision-Making Leave Day, the August 13, 2024, dismissal, and the October 4, 2024,

characterization of her separation as resignation or job abandonment, and to correct her separation records accordingly;

h. Award Plaintiff her reasonable attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988(b), and 42 U.S.C. § 12205; and

i. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this the 15th day of September 2026.

*/s/ Micheal L. Littlejohn Jr.*____
Micheal Littlejohn Jr.
N.C. State Bar No. 49353
**LITTLEJOHN LAW PLLC**
PO Box 16661 Charlotte NC 28297
704.322.4581 | mll@littlejohn-law.com
*Attorney for Plaintiff Eunika D. Smalls*